**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | Case No. 3:10-cv-346 |
| v. | § § | |
| DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, INC.; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, INC.; REPUBLICAN NATIONAL COMMITTEE; and NATIONAL REPUBLICAN SENATORIAL COMMITTEE, | § § § § § § § § § | |
| Defendants. | § | |

---

### RECEIVER'S ORIGINAL COMPLAINT AGAINST POLITICAL COMMITTEES

---

#### SUMMARY

1.     The Court has ordered Receiver Ralph S. Janvey ("Receiver") to take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants injured by a massive fraud orchestrated by Allen Stanford, James Davis, and others.

2.     The Receiver's investigation to date reveals that revenue from the sale of fraudulent certificates of deposit generated substantially all of the income for the Stanford Defendants, including Allen Stanford ("Stanford") and James Davis ("Davis"), the Stanford Financial Group, and the many related Stanford entities.

3.     Allen Stanford, James Davis, and the Stanford Financial Group contributed more than $1.8 million of their ill-gotten gains to a variety of political organizations and candidates.

The defendants in this case, the Democratic Senatorial Campaign Committee, Inc.; the National Republican Congressional Committee; the Democratic Congressional Campaign Committee, Inc.; the Republican National Committee; and the National Republican Senatorial Committee (collectively, the "Committee Defendants"), received more than $1.6 million in funds ultimately traceable to money investors paid to the Stanford Defendants for the purchase of fraudulent CDs.

4.     The Committee Defendants did not furnish any consideration whatsoever for the funds they received from Stanford, Davis, and the Stanford Financial Group.  Consequently, they have no legitimate right to retain the funds, and the Receiver is entitled to the return of all such funds.

5.     The Receiver has made written requests to the Committee Defendants for return of these funds, first in February 2009, and again in February 2010.  The Committee Defendants, however, have ignored these requests, and, as a result, the Receiver has been forced to file this lawsuit seeking the return of the funds to the Receivership Estate for the benefit of claimants.

6.     The Receiver seeks an order that: (a) the payments from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants constitute fraudulent transfers under applicable law; (b) the payments from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Committee Defendants are liable to the Receivership Estate for an amount equaling the payments they received from Stanford, Davis, and the Stanford Financial Group; and (d) the Receiver is entitled to an award of reasonable attorneys' fees, costs, and interest.

RECEIVER'S ORIGINAL COMPLAINT
AGAINST POLITICAL COMMITTEES                                                                                    2

## JURISDICTION & VENUE

7.      This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

8.      Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

9.      Further, within 10 days of his appointment, the Receiver filed the original Complaint and Order Appointing the Receiver in 26 United States district courts pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in each district where the Complaint and Order have been filed, including the District for the District of Columbia.

10.     This Court has personal jurisdiction over the Committee Defendants pursuant to F.R.C.P. 4(k)(1)(C) and 15 U.S.C. §§ 754 and 1692.

## THE PARTIES

11.     Plaintiff Ralph S. Janvey, acting in his capacity as Court-appointed Receiver, has been appointed by this Court as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Hold, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control (the "Receivership Assets").

12.     Defendant Democratic Senatorial Campaign Committee, Inc. is a District of Columbia corporation with its principal office in Washington, D.C.

13.     Defendant National Republican Congressional Committee is a political organization with its principal office in Washington, D.C.

14.     Defendant Democratic Congressional Campaign Committee, Inc. is a District of Columbia corporation with its principal office in Washington, D.C.

15.     Defendant Republican National Committee is a political organization with its principal office in Washington, D.C.

16.     Defendant National Republican Senatorial Committee is a political organization with its principal office in Washington, D.C.

17.     Each Defendant will be served pursuant to the Federal Rules of Civil Procedure, through their attorney of record, or by other means approved by this Court's order.

## STATEMENT OF FACTS

18.     On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB" or "the Bank"), Stanford Group Company, and Stanford Capital Management, LLC (collectively "Stanford Defendants").  On the same date, the Court signed an Order appointing a Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

### I.     *Stanford Defendants Operated a Fraudulent Ponzi Scheme*

19.     As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors exclusively through SGC Financial Advisors pursuant to a Regulation D private

placement.  First Amended Complaint (Doc. 48), ¶ 23.[1]  The CDs were sold by Stanford International Bank, Ltd.  *Id.*

20.    In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio.  *Id.* ¶ 31.

21.    In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."  SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers."  *Id.* ¶ 32.  Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."  *Id.* ¶ 45.

22.    In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."  *Id.* ¶ 44.  More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments.  *Id.*

23.    Consistent with its Annual Reports and brochures, SIB trained SGC Financial Advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."  *Id.* ¶ 46.  In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993).  *Id.* ¶ 24.

---

[1]        Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.,* Civil Action No. 3-09-CV-0298-N.

24.     Contrary to the Stanford Defendants' representations regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" - *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.).   In fact, at year-end 2008, the largest segments of the Bank's portfolio were: (i) at least $1.6 billion in undocumented "loans" to Defendant Allen Stanford; (ii) private equity; and (iii) grossly over-valued real estate.  *Id*. ¶¶ 24, 48.

25.     In an effort to conceal their fraud and ensure that investors continued to purchase the CD, the Stanford Defendants fabricated the performance of SIB's investment portfolio.  *Id*. ¶ 5.

26.     SIB's financial statements, including its investment income, were fictional.  *Id*. ¶ 37.  In calculating SIB's investment income, Defendants Stanford and Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio.  *Id*.  Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn.  *Id*.

27.     For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs.  *See id*. ¶ 1.  However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses.  As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

28.     Stanford Defendant Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning.  *See* Doc.  771  (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); *id.* at 41 ("Soon after [Mr. Davis] became Controller [of Allen Stanford's Montserrat bank]… in at least 1989… Stanford requested that, in order to show fictitious quarterly and annual profits, [Mr. Davis] make false entries into the general ledger for the purpose of reporting false revenues, and false investment portfolio balances to the banking regulators."); Doc. 807 (Davis Tr. of Rearraignment) at 19:18-21 ("As early as 1990, Mr. Davis… at the request of Allen Stanford, began… making false entries into the books and records of SIBL."); *id.* at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio").

## II.     *Stanford Transferred Funds from the Fraudulent Ponzi Scheme to the Committee Defendants*

29.     Funds from the Ponzi scheme described above were transferred by Allen Stanford, James Davis, and Stanford Financial Group to the Committee Defendants.  The dates, amounts, transferors, and transferees of each specific transfer are reflected in Exhibit A.

30.     The Committee Defendants received at least the following amounts in total transfers from Stanford, Davis, and the Stanford Financial Group:

| | |
|---|---|
| Democratic Senatorial Campaign Committee | $950,500 |
| National Republican Congressional Committee | $238,500 |
| Democratic Congressional Campaign Committee | $200,000 |
| Republican National Committee | $128,500 |
| National Republican Senatorial Committee | $83,345 |

31.     The Committee Defendants did not furnish any consideration whatsoever in exchange for the transfers.   Thus, the Committee Defendants did not provide reasonably equivalent value in exchange for these transfers.

32.     On or about February 23, 2009, the Receiver made a written demand to the Committee Defendants for return of the above-referenced payments.  After his first demand was ignored, the Receiver made a second written demand on or about February 9, 2010.  Because the Committee Defendants have ignored the Receiver's repeated written requests, the Receiver has been forced to file this lawsuit to carry out his Court-ordered duty to recover monies for the benefit of the victims of Stanford's fraudulent scheme.

## REQUESTED RELIEF

33.     This Court appointed Ralph S. Janvey as Receiver for the "assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants and all entities they own or control."  Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2.  The Receiver seeks the relief described herein in this capacity.

34.     Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."   Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4.  Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received

assets or records traceable to the Receivership Estate."  Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c).

35.     One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants.  *See* Amended Order Appointing Receiver (Doc. 157) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004).  But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate. Doc. 157 ¶ 5(b).

**I.      *The Receiver is Entitled to Disgorgement of Assets Fraudulently Transferred to the Committee Defendants.***

36.     The Receiver is entitled to disgorgement of the funds transferred from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants because such payments constitute fraudulent transfers under Texas law and other applicable law.  *See, e.g.,* TEX. BUS. & COMM. CODE § 24.005(a).   Stanford, Davis, and the Stanford Financial Group made the payments to the Committee Defendants with actual intent to hinder, delay, or defraud creditors; as a result, the Receiver is entitled to the disgorgement of those payments.

37.     The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."  *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Warfield v.*

*Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . .  The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").  The Stanford Defendants, including Stanford and Davis, and the Stanford Financial Group, were running a Ponzi scheme and transferred funds generated by that scheme to the Committee Defendants.

38.     Consequently, the burden is on the Committee Defendants to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.  *See, e.g., Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.").  Consideration that has no utility from the creditor's perspective does not satisfy the statutory definition of "value."  *SEC v. Resources Dev. Intern., LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).

39.     The Committee Defendants cannot meet their burden to establish that they provided reasonably equivalent value for the payments they received.  The Committee Defendants did not furnish any consideration whatsoever for the above-referenced transfers.  To the extent the Committee Defendants contend that Stanford, Davis, or the Stanford Financial Group received some sort of intangible non-economic benefit, such benefits do not constitute reasonably equivalent value in the context of claims for fraudulent transfer.  *See 1992 Republican Senate-House Dinner Committee v. Carolina's Pride Seafood, Inc.,* 858 F. Supp. 243, 249 (D.D.C. 1994), *vacated after settlement,* 158 F.R.D. 223 (D.D.C. 1994) (court refused to recognize intangible rewards of political contribution as reasonably equivalent value for fraudulent conveyance purpose); *U.S. v. Evans*, 513 F. Supp. 2d 825, 835 (W.D. Tex. 2007)

("The Fifth Circuit has concluded that intangible non-economic benefits do not constitute reasonably equivalent value for purposes of Texas fraudulent transfer law."). Accordingly, the Receiver is entitled to return of the funds transferred, which funds the Committee Defendants have no legitimate right to retain.

40.     The Receiver was only able to discover the fraudulent nature of the above-referenced transfers after Allen Stanford and his accomplices were removed from control of the Stanford entities. Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. *See Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *Warfield v. Carnie*, 2007 WL 1112591, at *8 (N.D. Tex. April 13, 2007); *see also* TEX. BUS. & COMM. CODE § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

41.     The Receiver is entitled to recover his costs and reasonable attorneys' fees incurred in pursuing these claims. *See* TEX. BUS. & COMM. CODE § 24.013.

42.     The Receiver therefore seeks an order that (a) the payments from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants constitute fraudulent transfers under applicable law; (b) the funds transferred from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Committee Defendants are liable to the Receivership Estate for an amount equaling the amount of funds transferred from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants; and (d) the

Receiver is entitled to recover his costs and reasonable attorneys' fees incurred in pursuing these claims, in addition to pre- and post-judgment interest on any award.

## PRAYER

43.    The Receiver respectfully requests an Order providing that:

(a)    the payments from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants constitute fraudulent transfers under applicable law;

(b)    the funds transferred from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate;

(c)    the Committee Defendants are liable to the Receivership Estate for an amount equaling the amount of funds transferred from Stanford, Davis, and the Stanford Financial Group to the Committee Defendants; and

(d)    the Receiver is entitled to recover his costs and reasonable attorneys' fees incurred in pursuing these claims, in addition to pre- and post-judgment interest on any award and all other relief to which he is justly entitled.

Dated:  February 19, 2010                    Respectfully submitted,

                                             **BAKER BOTTS L.L.P.**

                                             By: /s/ Kevin M. Sadler
                                                  Kevin M. Sadler
                                                  Texas Bar No. 17512450
                                                  kevin.sadler@bakerbotts.com
                                                  Robert I. Howell
                                                  Texas Bar No. 10107300
                                                  robert.howell@bakerbotts.com
                                                  David T. Arlington
                                                  Texas Bar No. 00790238
                                                  david.arlington@bakerbotts.com
                                                  1500 San Jacinto Center
                                                  98 San Jacinto Blvd.
                                                  Austin, Texas 78701-4039
                                                  (512) 322-2500
                                                  (512) 322-2501 (Facsimile)

                                                  Timothy S. Durst
                                                  Texas Bar No. 00786924
                                                  tim.durst@bakerbotts.com
                                                  2001 Ross Avenue
                                                  Dallas, Texas 75201
                                                  (214) 953-6500
                                                  (214) 953-6503 (Facsimile)


                                             **ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On February 19, 2010, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve the Democratic Senatorial Campaign Committee ("DSCC"); the National Republican Congressional Committee ("NRCC"); the Democratic Congressional Campaign Committee ("DCCC"); the Republican National Committee ("RNC"); and the National Republican Senatorial Committee ("NRSC") individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler