## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as **Court-Appointed Receiver for the Stanford International Bank, Ltd., et al.,** | § § § § | |
| **Plaintiff** | § § | |
| **vs.** | § § | NO.    3:10-CV-0346 |
| **DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, INC.; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, INC.; REPUBLICAN NATIONAL COMMITTEE; and NATIONAL REPUBLICAN SENATORIAL COMMITTEE,** | § § § § § § § § § § § | |
| **Defendants.** | § § § | |

## DEMOCRATIC COMMITTEE DEFENDANTS'
## <u>BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................1

II.     STATEMENT OF FACTS .....................................................................2

III.    ARGUMENT ..........................................................................................3

    A.      Legal Standard ...........................................................................3

    B.      Plaintiff's Claims Are Extinguished ..........................................4

        1.      Section 24.010 of TUFTA Is a Statute of Repose
            and Must Be Strictly Construed .......................................5

        2.      Plaintiff's Fraudulent Transfer Claims Extinguished
            Four Years After Each Respective Transfer .....................6

        3.      Even if TUFTA's Extinguishment Provision
            Operated as a Statute of Limitations, Plaintiff's
            Claims Would Have Extinguished One Year from
            the Date of His Appointment as Receiver ........................8

        4.      Plaintiff Reasonably Could Have Discovered the
            Transfers More than One Year Before He Filed Suit ...............9

    C.      Plaintiff's Fraudulent Transfer Claims Are Preempted by
        Federal Law ..............................................................................11

        1.      Congress Intended to Preempt State Law ......................12

        2.      State Law Claims Seeking to Define Political
            Contributions as Illegal Are Preempted by FECA ...................13

        3.      FEC Regulations Establish When and How Political
            Contributions Must Be Disgorged .................................15

        4.      BCRA Provided An Exclusive Statutory Process to
            Dispose of "Soft Money" Contributions .......................16

    D.      Dismissal Should Be With Prejudice .......................................18

IV.     CONCLUSION .....................................................................................19

04005-0020/LEGAL18167914.1

# TABLE OF AUTHORITIES

## Cases

Balistreri v. Pacifica Police Dep't, 901 F.2d 696 (9th Cir. 1990) ...................................4

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ..................................................3

Cadle Co. v. Wilson, 136 S.W.3d 345 (Tex. App.—Austin 2004, no pet.) ...........................5, 6, 9

Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992) ...............................................13

Coleman v. Dretke, 409 F.3d 665 (5th Cir. 2005) ......................................................10

Duran v. Henderson, 71 S.W.3d 833 (Tex. App.—Texarkana 2002, pet. denied) ....................5, 6, 8

English v. Gen. Elec. Co., 496 U.S. 72 (1990) .........................................................12

Fleming v. Lind-Waldock & Co., 922 F.2d 20 (1st Cir. 1990) ...........................................7

Galbraith Eng'g Consultants, Inc. v. Pochucha, 290 S.W.3d 863 (Tex. 2009) ........................5, 6

Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305 (5th Cir. 2002) ..........18

Hunt v. Am. Bank & Trust Co., 606 F. Supp. 1348 (N.D. Ala. 1985), aff'd, 783 F.2d 1011 (11th Cir. 1986) .....11

McCandless v. Furlaud, 296 U.S. 140 (1935) ...........................................................7

McConnell v. FEC, 540 U.S. 93 (2003), overruled in part on other grounds, Citizens United v. FEC, 130 S. Ct. 876 (2010) ..........17

Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin, No. 08-0316, 2010 WL 852160 (Tex. Mar. 12, 2010) .....6, 7

Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992) ...........................................13

Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377 (2000) ..................................................17

O'Toole v. Northrop Grumman Corp., 499 F.3d 1218 (10th Cir. 2007).................................10

Quilling v. Cristell, No. 304CV252, 2006 WL 316981 (W.D.N.C. Feb. 9. 2006)........................7, 8, 9

Reneker v. Offill, No. 3:08-CV-1394-D, 2009 WL 804134 (N.D. Tex. Mar. 26, 2009) .....7

Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995) .......................................................8

Shell Oil Co. v. Ross, No. 01-08-00713-CV, 2010 WL 670549 (Tex. App.—Houston 1st Dist. Feb. 25, 2010, no pet. hist.) .....10

## TABLE OF AUTHORITIES
### (continued)

Silkwood v. Kerr-McGee Corp., 464 U.S. 238 (1984)............................................12

Smith v. Am. Founders Fin., Corp., 365 B.R. 647 (S.D. Tex. 2007) ...............................5

Sprewell v. Golden State Warriors, 266 F.3d 979 (9th Cir. 2001),
    amended, 275 F.3d 1187 (9th Cir. 2001)...................................................4

Teper v. Miller, 82 F.3d 989 (11th Cir. 1996)...................................................13, 14

Truk Int'l Fund LP v. Wehlmann, No. 4:09-CV-308-A, 2009 WL 4496225
    (N.D. Tex. Dec. 3, 2009)..................................................................10

United States ex rel. Lam v. Tenet Healthcare Corp., 481 F. Supp. 2d 673
    (W.D. Tex. 2006).........................................................................2

Vaughn v. Fedders Corp., No. 4:04-CV-313-Y, 2005 WL 5569953 (N.D.
    Tex. Aug. 29, 2005), rev'd on other grounds, 239 Fed.Appx. 27 (5th
    Cir. 2007)...............................................................................4

Warfield v. Carnie, No. 3:04-cv-633-R, 2007 WL 1112591 (N.D. Tex.
    Apr. 13, 2007)........................................................................7, 10

Weber v. Heaney, 995 F.2d 872 (8th Cir. 1993) ...............................................13

WesternGeco v. Ion Geophysical Corp., No. 09-cv-1827, 2009 WL
    3497123 (S.D. Tex. Oct. 28, 2009) ........................................................4

Wing v. Kendrick, No. 2:08-CV-01002-DB, 2009 WL 1362383 (D. Utah
    May 14, 2009), recons. denied, 2009 WL 2477639 (D. Utah Aug. 10,
    2009)....................................................................................9

**Statutes**

2 U.S.C. § 431 ...............................................................................3

2 U.S.C. § 434 ..............................................................................10

2 U.S.C. § 441a(a)(1)(B)......................................................................14

2 U.S.C. § 441a(a)(2)(B)......................................................................14

2 U.S.C. § 441b(a)........................................................................14, 17

2 U.S.C. § 441c..............................................................................14

2 U.S.C. § 441e..............................................................................14

# TABLE OF AUTHORITIES
### (continued)

2 U.S.C. § 441f ................................................................................................................ 14

2 U.S.C. § 441i(a) ........................................................................................................... 17

2 U.S.C. § 453 ................................................................................................................. 15

2 U.S.C. § 453(a) ............................................................................................................ 12

Tex. Bus. & Com. Code § 24.001 .............................................................................passim

Tex. Bus. & Com. Code Ann. § 24.005(a)(1) ........................................................... 4, 5, 6

Tex. Bus. & Com. Code Ann. § 24.005(a)(2) ............................................................... 4, 5

Tex. Bus. & Com. Code Ann. § 24.006(a) .................................................................... 4, 5

Tex. Bus. & Com. Code Ann. § 24.006(b) .................................................................... 4, 5

Tex. Bus. & Com. Code Ann. § 24.010 ......................................................................... 4, 5

Tex. Bus. & Com. Code Ann. § 24.010(a) ......................................................................... 5

Tex. Bus. & Com. Code Ann. § 24.010(a)(1) .............................................................. 5, 6, 8

## Regulations and Rules

11 C.F.R. § 102.9(e) ........................................................................................................ 16

11 C.F.R. § 103.3(b) ........................................................................................................ 15

11 C.F.R. § 103.3(b)(1) ................................................................................................... 15

11 C.F.R. § 103.3(b)(2) ................................................................................................... 16

11 C.F.R. § 103.3(b)(3) ................................................................................................... 16

11 C.F.R. § 104.8(d)(4) ................................................................................................... 16

11 C.F.R. § 108.7(b) ........................................................................................................ 12

11 C.F.R. § 300.12(a) ................................................................................................. 17, 18

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 3, 4

## Constitutional Provisions

U.S. Const. art. VI, § 2 ................................................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

**Other Authorities**

Bipartisan Campaign Reform Act of 2002 .................................................................12, 16, 17, 18

FEC Adv. Op. 1988-21 (May 16, 1988).................................................................................15

FEC Adv. Op. 1999-12 (June 25, 1999)................................................................................13

Federal Election Campaign Act of 1971 ........................................................................passim

H.R. Rep. No. 93-1239 (1974), reprinted in FEC, Legislative History of
     Federal Election Campaign Act Amendments of 1974 (1977) ...................................13

Marc DeCambre, Billionaire Schmoozed Sports Bigs, Pols, N.Y. Post,
     Feb. 18, 2009 ........................................................................................................11

Martha Brannigan, SEC Accuses Stanford Group Owner of Massive
     Ongoing Fraud, Miami Herald, Feb. 18, 2009 ............................................................11

Pub. L. No. 107-155, § 402(b)(2)(B)(i), 116 Stat. 81 (2002) ........................................17

S. Conf. Rep. No. 93-443 (1974), reprinted in 1974 U.S.C.C.A.N. 5618...............13, 14

Stanford was looking for Washington's embrace, Reuters, Feb. 17, 2009 ...................11

Stephen Labaton & Charlie Savage, S.E.C. Fines Didn't Avert Stanford
     Group Case, N.Y. Times, Feb. 18, 2009 ................................................................2, 11

Todd Gillman, Texas billionaire Stanford accused of $8B banking fraud
     supplied Cornyn trip, political donations, Dallas Morning News, Feb.
     18, 2009 ................................................................................................................11

Tom Hamburger & Peter Wallsten, President's fund gives value of tainted
     Stanford campaign donation to charity, Chi. Trib., Feb. 18, 2009............................11

Uniform Fraudulent Transfer Act, § 9, 7A-2 U.L.A. 266, 359 cmt. (1999)....................6

## I.     INTRODUCTION

Plaintiff Ralph S. Janvey, Receiver for Allen Stanford and his affiliated entities, seeks avoidance of political contributions made by Mr. Stanford, his associates and his companies, some of which date back more than ten years.  Plaintiff is not entitled to disgorgement of the funds transferred to defendants Democratic Senatorial Campaign Committee, Inc. ("DSCC") and Democratic Congressional Campaign Committee, Inc. ("DCCC") for two independent reasons.

First, any cognizable claims Plaintiff may have had against defendants have been extinguished under the statute of repose incorporated in the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. Code § 24.001 et seq.  TUFTA's statute of repose is strictly construed to establish deadlines by which Plaintiff's claims are not simply procedurally barred, but are extinguished altogether.  TUFTA's extinguishment provision requires that fraudulent transfer claims be brought within four years of the transfers, and as Plaintiff seeks avoidance of transfers made over four years ago, his claims are extinguished.  Furthermore, even if equitable tolling principles and the discovery rule applied to their fullest extent, Plaintiff's claims still would have been extinguished before he filed suit.

Second, Plaintiff's state law claims are preempted by federal law.  Federal election law expressly preempts any provision of state law regarding elections to federal office, including those that affect the financing of federal political committees.  Moreover, federal law provides a comprehensive scheme setting forth the grounds on which political funds are subject to disgorgement, preempting Plaintiff's attempt to carve out a new basis for a mandatory refund.  Finally, the ultimate disposal of the vast majority of political contributions at issue here was subject to a specific federal statute, which does not permit disgorgement to this Plaintiff at this late hour.

For each of these reasons, defendants DSCC and DCCC seek dismissal of the Complaint.

## II.     STATEMENT OF FACTS

The bulk of Plaintiff's Complaint relates to allegations of fraud against Mr. Stanford, his associates and companies (collectively, the "Stanford Defendants"). According to Plaintiff, the Stanford Defendants operated a fraudulent Ponzi scheme, Compl. ¶ 28, by marketing high-yield certificates of deposit to investors, id. ¶ 20, and fabricating the performance of the investment portfolio maintained by Stanford International Bank, Ltd., id. ¶ 25. Plaintiff alleges that the Stanford Defendants misappropriated investor funds to gamble on speculative investments and finance Mr. Stanford's "lavish lifestyle." Id. ¶ 24.

On February 16, 2009, the Securities and Exchange Commission ("SEC") filed suit against the Stanford Defendants. Id. ¶ 18. On the same date, the Court appointed Plaintiff as Receiver "over all property, assets, and records of the Stanford Defendants, and all entities they own or control." Id. The suit against the Stanford Defendants drew immediate attention in the national media to their past political contributions, including those made to the DSCC and DCCC (together, the "Committees"), which had long been a matter of public record. See, e.g., Stephen Labaton & Charlie Savage, S.E.C. Fines Didn't Avert Stanford Group Case, N.Y. Times, Feb. 18, 2009 (Democratic Committee Defendants' Appendix in Support of Their Motion to Dismiss ("Appendix") Ex. A).[1]

More than a year after Plaintiff's appointment as Receiver, Plaintiff filed this suit claiming that funds from the alleged Ponzi scheme were transferred by the Stanford Defendants

---

[1] The Committees request that the Court take judicial notice of the news articles cited in this brief and included as Exhibits A through F in the attached Appendix. "Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles." United States ex rel. Lam v. Tenet Healthcare Corp., 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006); see also id. (noting that the existence and coverage of newspaper and magazine articles "are both generally known and capable of accurate determination by resort to sources whose accuracy cannot reasonably be questioned").

to the Committees.  Compl. ¶ 29.  Citing political contributions ranging from February 2000 to

July 2005, Plaintiff asserts that the Committees received a total of $1,150,000 from Mr. Stanford,

his associate James Davis and Stanford Financial Group ("SFG").  Id. ¶ 30; Compl. app. at 1-2.

Plaintiff does not allege that the Committees knew or had reason to suspect that Mr. Stanford or

his affiliated entities were operating a fraudulent scheme.  Still, Plaintiff contends that he is

entitled to disgorgement of the funds "because such payments constitute fraudulent transfers

under Texas law and other applicable law."  Compl. ¶ 36.

## III.    ARGUMENT

Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief

may be granted under Federal Rule of Civil Procedure 12(b)(6) on either of two separate

grounds.  First, Plaintiff failed to timely file his fraudulent transfer claims under TUFTA.

Second, Plaintiff's fraudulent transfer claims are preempted by the Federal Election Campaign

Act of 1971, 2 U.S.C. § 431 et seq.  For the reasons discussed more fully below, the Committees

urge the Court to dismiss this action.

## A.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations

"must be enough to raise a right to relief above the speculative level[.]"  Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 555 (2007).  The plaintiff's allegations must plausibly suggest, and not

merely be consistent with, the claimed wrongful conduct.  Id. at 557.  Thus, although the factual

allegations of the complaint are assumed to be true, the plaintiff must provide "more than labels

and conclusions, and a formulaic recitation of the elements of a cause of action[.]"  Id. at 555.

Moreover, courts do not accept as true factual allegations that are contradicted by judicially

noticeable facts or by documents referenced in the complaint.  Sprewell v. Golden State

Warriors, 266 F.3d 979, 988 (9th Cir. 2001), amended, 275 F.3d 1187 (9th Cir. 2001);

WesternGeco v. Ion Geophysical Corp., No. 09-cv-1827, 2009 WL 3497123, at *2 (S.D. Tex.

Oct. 28, 2009).

     In accord with these standards, dismissal under Rule 12(b)(6) is proper when the plaintiff

either lacks a "cognizable legal theory" or has failed to present "sufficient facts alleged under a

cognizable legal theory."  Vaughn v. Fedders Corp., No. 4:04-CV-313-Y, 2005 WL 5569953, at

*4 (N.D. Tex. Aug. 29, 2005), rev'd on other grounds, 239 Fed.Appx. 27 (5th Cir. 2007) (citing

Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)).  Here, even accepting

Plaintiff's allegations as true for purposes of this motion, and drawing all reasonable inferences

in favor of Plaintiff, Plaintiff's Complaint fails to state a claim on which relief can be granted.

Accordingly, Plaintiff's Complaint must be dismissed.

**B.**    **Plaintiff's Claims Are Extinguished.**

     Causes of action arising under TUFTA are subject to extinguishment under Section

24.010.  A TUFTA fraudulent transfer claim "is extinguished unless" the action is brought:

> (1) under Section 24.005(a)(1)  of this code, within four years after
> the transfer was made or the obligation was incurred or, if later,
> within one year after the transfer or obligation was or could
> reasonably have been discovered by the claimant;
>
> (2) under Section 24.005(a)(2)  or 24.006(a)  of this code, within
> four years after the transfer was made or the obligation was
> incurred; or
>
> (3) under Section 24.006(b)  of this code, within one year after the
> transfer was made.

Tex. Bus. & Com. Code Ann. § 24.010(a).  Section 24.010(a)(1) thus provides a plaintiff with the longest possible limitations period in which to file suit.[2]  Here, Plaintiff filed suit only after his claims were extinguished by Section 24.010(a)(1) .

1.    **Section 24.010 of TUFTA Is a Statute of Repose and Must Be Strictly Construed.**

Texas and federal courts alike have held that Section 24.010 of TUFTA operates as a statute of repose rather than as a procedural statute of limitations.  See Smith v. Am. Founders Fin., Corp., 365 B.R. 647, 676 (S.D. Tex. 2007); Cadle Co. v. Wilson, 136 S.W.3d 345, 350 (Tex. App.—Austin 2004, no pet.); Duran v. Henderson, 71 S.W.3d 833, 837-38 (Tex. App.—Texarkana 2002, pet. denied).[3]  "[T]here are significant differences between the two."  Galbraith Eng'g Consultants, Inc. v. Pochucha, 290 S.W.3d 863, 866 (Tex. 2009).  While a statute of limitations is a procedural device that merely bars enforcement of a right, a statute of repose "takes away the right altogether after the specified time period has expired,"  Duran, 71 S.W.3d at 838, "creat[ing] a substantive right in those protected to be free from liability after a legislatively-determined period,"  id. at 837.  Most importantly, "unlike statutes of limitations, a statute of repose is not subject to judicially crafted rules of tolling or deferral."  Methodist

---

[2] Although the Complaint broadly refers to causes of action under "Texas law and other applicable law," Compl. ¶ 36, its allegations only refer to fraudulent transfer claims brought under Section 24.005(a)(1) of TUFTA.  See id. (referring to the Stanford Defendants' "actual intent to hinder, delay, or defraud" creditors); id. ¶ 40 (citing the limitations period provided in Section 24.010(a)(1)).  To the extent Plaintiff raises any claims under Section 24.005(a)(2), 24.006(a) or 24.006(b) of TUFTA, those claims are extinguished on the same basis as his Section 24.005(a)(1) claims.  As discussed below, all of the allegedly fraudulent transfers occurred more than four years before Plaintiff filed suit.

[3] "When adjudicating claims for which state law provides the rules of decision," federal courts must "apply the law as interpreted by the state's highest court."  Ladue v. Chevron USA, Inc., 920 F.2d 272, 274 (5th Cir. 1991).  Where the state's highest court has not yet spoken on an issue, however, federal courts may look to the state's appellate courts for guidance.  Am. Nat'l Gen. Ins. Co. v. Ryan, 274 F.3d 319, 328 (5th Cir. 2001).

04005-0020/LEGAL18167914.1

Healthcare Sys. of San Antonio, Ltd. v. Rankin, No. 08-0316, 2010 WL 852160, at *2 (Tex. Mar. 12, 2010).[4]

As a statute of repose, TUFTA's extinguishment provision is "intended to be strictly construed," Cadle, 136 S.W.3d at 350, in order to "'mitigate the uncertainty'" surrounding the filing of fraudulent transfer actions, Duran, 71 S.W.3d at 838 (quoting Uniform Fraudulent Transfer Act ("UFTA") § 9, 7A-2 U.L.A. 266, 359 cmt. (1999)).  By promoting fixed and inflexible filing deadlines that are not subject to equitable tolling principles, TUFTA's statute of repose protects good faith transferees from the burden of indefinite potential liability.  See Galbraith Eng'g Consultants, 290 S.W.3d at 866.

### 2.    Plaintiff's Fraudulent Transfer Claims Extinguished Four Years After Each Respective Transfer.

TUFTA provides that an action brought under Section 24.005(a)(1) is extinguished unless it is brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  Tex. Bus. & Com. Code Ann. § 24.010(a)(1).  Thus, "[i]t is clear from the text of the statute that the legislature has chosen to preserve application of the discovery rule to some extent within the provisions of TUFTA."  Cadle, 136 S.W.3d at 350.  However, because the Stanford entities represented by Plaintiff "discovered" the transfers the moment they occurred, the discovery rule is not triggered.

There is no question that the contributions to the Committees were made well outside the four-year period.  Plaintiff alleges that the Stanford Defendants contributed $200,000 to the DCCC between 2000 and 2003, with the last transfer occurring on May 31, 2003.  Compl. app.

---

[4] State tolling principles are to be the "'primary guide'" for federal courts applying state statutes of limitations. FDIC v. Dawson, 4 F.3d 1303, 1309 (5th Cir. 1993) (quoting Johnson v. Ry. Express Agency, 421 U.S. 454, 465 (1975)).

at 2.  He further alleges that the DSCC received $950,500 from the Stanford Defendants between 2000 and 2005, with the last transfer occurring on July 20, 2005.  Id. app. at 1.  Plaintiff filed his Complaint on February 19, 2010, four years and six months after the last alleged transfer to either of the Committees.

Nor is there any doubt that Mr. Stanford and the Stanford entities Plaintiff represents knew of each contribution the moment it was made.  "A receiver stands in the place of the individuals and entities over whose property he has been appointed receiver," Reneker v. Offill, No. 3:08-CV-1394-D, 2009 WL 804134, at *5 (N.D. Tex. Mar. 26, 2009), and therefore he "'has no greater rights or powers than the [entity] itself would have.'"  Fleming v. Lind-Waldock & Co., 922 F.2d 20, 25 (1st Cir. 1990) (quoting McCandless v. Furlaud, 296 U.S. 140, 148 (1935)).  Because "the receiver can only make a claim which the [entity] could have made," id., the Stanford Defendants' knowledge of the contributions the moment they occurred is imputed to the receiver.  Consequently, Plaintiff's discovery date is not "later" than the date of each transfer, and the one-year discovery period does not operate to extend the four-year period of repose after which the fraudulent transfer claims were extinguished.

Some courts applying other states' laws have held that the doctrine of adverse domination tolls the date of discovery of a fraudulent transfer as long as a corporation remains under the control of the alleged wrongdoers.  See Warfield v. Carnie, No. 3:04-cv-633-R, 2007 WL 1112591, at *17 (N.D. Tex. Apr. 13, 2007) (applying Washington state law); Quilling v. Cristell, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 9. 2006) (applying North Carolina and Florida law).  But statutes of repose are "not subject to judicially crafted rules of tolling or deferral," Methodist, 2010 WL 852160, at *2.  TUFTA's statute of repose thus prevents Plaintiff

- 7 -

from reaping the benefits of equitable tolling principles in pursuing his fraudulent transfer claims.

Plaintiff failed to bring his claims within the four-year period of repose, and therefore they "may not be brought at all."  <u>Duran</u>, 71 S.W.3d at 838.

### 3. Even if TUFTA's Extinguishment Provision Operated as a Statute of Limitations, Plaintiff's Claims Would Have Extinguished One Year from the Date of His Appointment as Receiver.

Even if TUFTA's extinguishment provision were subject to equitable tolling doctrines, Plaintiff's fraudulent transfer claims would still be time-barred.  "Equitable tolling principles recognize that so long as a corporation remains under the control of the wrongdoers, it cannot be expected to take action to vindicate the harms and injustices perpetrated by the wrongdoers."  <u>Quilling</u>, 2006 WL 316981, at *6.  Once the alleged wrongdoer is removed from control, however, the entities are "[f]reed from his spell," <u>Scholes v. Lehmann</u>, 56 F.3d 750, 754 (7th Cir. 1995), and can act on their knowledge of the transfers through the receiver who represents their interests.  Thus, the doctrine of adverse domination tolls the one-year discovery period only during the period of domination and control.

Under the doctrine of adverse domination, the transfers at issue here "could reasonably have been discovered," Tex. Bus. & Com. Code Ann. § 24.010(a)(1), on February 16, 2009, the day Mr. Stanford was removed from control of the Stanford entities and Plaintiff was appointed as Receiver.  In fact, the very cases Plaintiff cites to support his reliance on equitable tolling principles held that transfers are discoverable once the receiver is placed in control of the receivership entities.  <u>Wing v. Kendrick</u>, No. 2:08-CV-01002-DB, 2009 WL 1362383, at *3 (D. Utah May 14, 2009) ("The discovery rule generally applies in cases involving Ponzi scheme entities that have been placed in the hands of an equity receiver because the fraudulent nature of

the transfers can only be discovered once the Ponzi operator has been removed from the scene. . . .  The Receiver was appointed on May 5, 2008 and filed this case on New Year's Eve of the same year; accordingly his claims against Kendrick are not barred by the UFTA's statute of limitations."), recons. denied, 2009 WL 2477639 (D. Utah Aug. 10, 2009); Quilling, 2006 WL 316981, at *7 ("The Receiver was appointed on May 21, 2003.  *Once he was appointed, the illegitimate nature of the transfers involved in this lawsuit could be discovered*.  This lawsuit was filed on May 20, 2004, which is within one year of when the fraudulent transfer was or reasonably could have been discovered.") (emphasis added).  Thus, even if the adverse domination principle were to toll TUFTA's one-year discovery period, the domination in this case ended on February 16, 2009, more than one year before suit was filed on February 19, 2010.  Plaintiff's failure to file suit until three days after his claims were extinguished bars any claim to relief.

### 4.    Plaintiff Reasonably Could Have Discovered the Transfers More than One Year Before He Filed Suit.

Finally, any additional inquiry into when Plaintiff himself could have discovered these transfers once he was appointed does not save Plaintiff's claims from extinguishment.  The question under TUFTA's extinguishment provision "is not whether the particular plaintiff was able to discover the injury at issue in the particular case within the statutory period," but rather "would a plaintiff exercising reasonable diligence discover the injury within the limitations period?"  Cadle, 136 S.W.3d at 351.  Here, a reasonably diligent receiver could not but discover these political contributions before February 19, 2009.

First, the political contributions had been openly disclosed by the Committees upon their receipt.  On February 16, 2009, they were on the public record and accessible on the Internet, barring any claim that these transfers were concealed in any manner that would toll Plaintiff's

- 9 -

reasonable discovery beyond the date he was charged with investigating and recovering receivership assets.  Cf. Warfield, 2007 WL 1112591, at * 17-18 (applying Washington's doctrine of fraudulent concealment to toll the receiver's reasonable discovery date); Shell Oil Co. v. Ross, No. 01-08-00713-CV, 2010 WL 670549, at *7 (Tex. App.—Houston 1st Dist. Feb. 25, 2010, no pet. hist.) ("To prove fraudulent concealment, a plaintiff must show that the defendant actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong.").  Under federal law, all of the contributions are a matter of public record. See 2 U.S.C. § 434 (public disclosure requirements); id. § 438(a) (requiring the Federal Election Commission ("FEC") to make contribution reports available for public inspection).  In addition, several Web sites provide information on political contributions with just a few clicks of a mouse.  For example, www.opensecrets.org, the Web site maintained by the Center for Responsive Politics, reveals the precise date, amount and recipient of each contribution from Mr. Stanford and his affiliated entities.[5]  Information regarding the contributions at issue was thus readily available as of the date Plaintiff was appointed Receiver.

Additionally, media reports about Mr. Stanford's political contributions were widespread during the days following Plaintiff's appointment.  For example, a New York Times article published on February 18, 2009 noted that "since 2000, Mr. Stanford and his firm, along with its employees and its political action committee, have given $2.4 million in campaign contributions, according to the Center for Responsive Politics – about two-thirds to Democrats."  Stephen

---

[5] The Committees request that the Court take judicial notice of the availability of the information contained on this Web site, as it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" pursuant to Fed. R. Evid. 201(b)(2).  See Coleman v. Dretke, 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of Texas agency's Web site); O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web."); cf. Truk Int'l Fund LP v. Wehlmann, No. 4:09-CV-308-A, 2009 WL 4496225, at *11 n.10 (N.D. Tex. Dec. 3, 2009) ("On a motion to dismiss, a court may take judicial notice of publicly reported stock prices. . . ."). Screen shots of this Web site are attached as Appendix Exhibit G.

Labaton & Charlie Savage, S.E.C. Fines Didn't Avert Stanford Group Case, N.Y. Times, Feb. 18, 2009 (Appendix Ex. A).  Information discoverable and published by the New York Times must also have been discoverable by the Receiver for the Stanford Defendants, who is "held to the highest standard of due diligence," Hunt v. Am. Bank & Trust Co., 606 F. Supp. 1348, 1358 (N.D. Ala. 1985), aff'd, 783 F.2d 1011 (11th Cir. 1986).  This article is just one of scores of media reports providing notice of Mr. Stanford's support for the Democratic Party.[6]  Accordingly, there can be no doubt that the cause of action accrued before February 19, 2009.

In sum, even under the most expansive construction of TUFTA's extinguishment provision, Plaintiff's suit is untimely.  The political contributions to the Committees were immediately discoverable on February 16, 2009 for any reasonably diligent plaintiff.  Moreover, Plaintiff's failure to discover these transfers before February 19, 2009 could only result from inexcusable ignorance of widespread media coverage.  Regardless of any added protections that may be afforded him by equitable tolling doctrines and the discovery rule, Plaintiff failed to bring his claims within the statutory time limitations.

## C.     Plaintiff's Fraudulent Transfer Claims Are Preempted by Federal Law.

Plaintiff seeks to disgorge the Committees of political contributions made by the Stanford Defendants.  However, the Federal Election Campaign Act of 1971 ("FECA") expressly preempts any state laws that affect the financing of federal elections.  FEC regulations promulgated pursuant to the Act further establish a comprehensive scheme regarding when and

---

[6] See, e.g., Martha Brannigan, SEC Accuses Stanford Group Owner of Massive Ongoing Fraud, Miami Herald, Feb. 18, 2009 (Appendix Ex. B); Marc DeCambre, Billionaire Schmoozed Sports Bigs, Pols, N.Y. Post, Feb. 18, 2009 (Appendix Ex. C) ("Since 1996, Stanford has donated $861,000 to various political causes and candidates, most of them Democrats, including $500,000 to the Democratic Senatorial Campaign Committee, President Barack Obama, Sen. Chuck Schumer and US Rep. Charlie Rangel."); Todd Gillman, Texas billionaire Stanford accused of $8B banking fraud supplied Cornyn trip, political donations, Dallas Morning News, Feb. 18, 2009 (Appendix Ex. D) ("Stanford donated heavily to both sides."); Tom Hamburger & Peter Wallsten, President's fund gives value of tainted Stanford campaign donation to charity, Chi. Trib., Feb. 18, 2009 (Appendix Ex. E); Stanford was looking for Washington's embrace, Reuters, Feb. 17, 2009 (Appendix Ex. F).

- 11 -

how contributions received by political committees are subject to disgorgement.  Finally, the

Bipartisan Campaign Reform Act of 2002 ("BCRA") established the exclusive means by which

the majority of the contributions at issue could be used.

### 1.    Congress Intended to Preempt State Law.

Acts of Congress may preempt state laws under the Supremacy Clause.  U.S. Const.

art. VI, § 2.  There are generally three broad categories of federal preemption.  See English v.

Gen. Elec. Co., 496 U.S. 72, 78-79 (1990).  Express preemption occurs where Congress has

explicitly declared its intent to preclude state regulation in a given area.  Id. at 78.  Implied

preemption occurs where the federal statutory scheme reflects Congress's intent to "occupy a

given field."  Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984).  Conflict preemption

occurs where Congress has not entirely displaced state regulation in a specific area, but where a

state law actually conflicts with federal law, making compliance with both state and federal

requirements impossible.  English, 496 U.S. at 79.  Express preemption is the least ambiguous

and the most powerful: "[W]hen Congress has made its intent known through explicit statutory

language, the courts' task is an easy one."  Id.

Congress made its intent to preempt state law explicit in FECA.  FECA provides that "the

provisions of this Act, and of rules prescribed under the Act, supersede and preempt any

provision of State law with respect to election for Federal office."  2 U.S.C. § 453(a).  Thus, on

its face the Act's preemptive reach extends to the regulation of campaign financing for federal

elective office through federal political committees.  See also 11 C.F.R. § 108.7(b) ("Federal law

supersedes State law concerning the . . . [l]imitation on contributions and expenditures regarding

Federal candidates and political committees.").

The legislative history demonstrates the intended sweep of this provision.  The House Committee drafting the preemption provision intended it "to preempt all state and local laws . . . [and] to make certain that the Federal law is construed to occupy the field."  H.R. Rep. No. 93-1239, at 10 (1974), reprinted in FEC, Legislative History of Federal Election Campaign Act Amendments of 1974, at 631, 644 (1977).  The Senate Conference Report further "make[s] it clear that the Federal law occupies the field with respect to . . . the sources of campaign funds used in Federal races."  S. Conf. Rep. No. 93-443 (1974), reprinted in 1974 U.S.C.C.A.N. 5618, 5638.  In accordance with Congress's legislative intent, the FEC, charged by Congress to formulate policy with regard to the Act, has broadly interpreted FECA's preemption provision.  See FEC Adv. Op. 1999-12, at 6 (June 25, 1999) ("In numerous advisory opinions, the Commission has applied the Act's broad preemptive power.").

> **2.      State Law Claims Seeking to Define Political Contributions as Illegal Are Preempted by FECA.**

Because Congress has explicitly preempted state law in Section 453 of FECA, the Court's "task is only to 'identify the domain expressly pre-empted.'"  Weber v. Heaney, 995 F.2d 872, 875 (8th Cir. 1993) (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992)).  A federal preemption provision "displaces all state laws that fall within its sphere, even including state laws that are consistent" with the federal requirements.  Morales v. Trans World Airlines, Inc., 504 U.S. 374, 387 (1992) (internal quotations and citation omitted).  Furthermore, "it is the *effect* of the state law that matters in determining preemption, not its intent or purpose."  Teper v. Miller, 82 F.3d 989, 995 (11th Cir. 1996) (applying FECA preemption).  State laws are preempted even if their purpose is completely unrelated to elections if, as applied, they encroach on federal law.  See id.

"Various FECA provisions . . . place limitations on the amounts of campaign contributions and expenditures by individuals and corporations, and restrict the use of such funds." Teper, 82 F.3d at 994.  Specifically, Sections 441a through 441f of FECA provide a comprehensive list of source restrictions on political contributions.  See 2 U.S.C. § 441a(a)(1)(B) (prohibiting individual contributions to national party committees in excess of $25,000 a year); id. § 441a(a)(2)(B)  (prohibiting contributions from a multicandidate political committee to a national political committee in excess of $15,000 a year); id. § 441b(a)  (prohibiting contributions from national banks, corporations and labor unions); id. § 441c (prohibiting contributions from certain federal government contractors); id. § 441e (prohibiting contributions from foreign nationals); id. § 441f (prohibiting contributions made in the name of another).  This list makes plain Congress's intent to occupy the domain of defining illegal sources of political contributions.  Plaintiff's fraudulent transfer claims seek to supplement this list of illegal sources to include Ponzi scheme funds, but because federal law "occupies the field with respect to . . . the sources of [federal] campaign funds," S. Conf. Rep. No. 93-443 (1974), reprinted in 1974 U.S.C.C.A.N. at 5638, Plaintiff's attempt to impose yet another source restriction on political contributions is preempted.

Furthermore, allowing Plaintiff to pursue his fraudulent transfer claims would compromise the certainty provided by FECA's source restrictions.  These detailed and comprehensive statutory provisions tell political committees specifically which contributions they may use toward influencing federal elections, and which contributions must be returned or refunded.  The Committees have invested considerable sums in FECA compliance procedures and planned their political activities in accordance with the fund-raising restrictions imposed by the Act.  If federal political committee funds are deemed subject to state law restrictions in

- 14 -

addition to the numerous federal restrictions, the Committees could not safely amass funds to engage in core First Amendment activity.[7]

Thus, as federal law has explicitly and comprehensively defined all illegal sources of political contributions, Plaintiff may not broaden that definition under a state law theory of recovery.

### 3.   FEC Regulations Establish When and How Political Contributions Must Be Disgorged.

Not only does federal law enumerate the illegal sources of political contributions, it also establishes a comprehensive regulatory scheme regarding the specific manner and timing in which illegal contributions must be returned or refunded.

FECA's preemption provision makes clear that the "rules prescribed under this Act" have the same preemptive effect as the Act itself.  2 U.S.C. § 453.  See also Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes.").  Pursuant to its delegated authority, the FEC has set forth the circumstances governing contribution refunds. FEC regulations provide that political committee treasurers are "responsible for examining all contributions received for evidence of illegality and for ascertaining whether contributions received . . . exceed the contribution limitations."  11 C.F.R. § 103.3(b).  Any contributions that present "genuine questions" as to whether they were made by an illegal source must be either returned to the contributor or deposited into a campaign depository within ten days of the treasurer's receipt.  Id. § 103.3(b)(1) .  If the contribution "cannot be determined to be legal"

---

[7] This is why, inter alia, the FEC has found various state law funding restrictions to be preempted.  See, e.g., FEC Adv. Op. 1988-21, at 3 (May 16, 1988) (holding that FECA preempted an Orange County, California ordinance restricting contributions by so-called "County Influence Brokers," saying that Congress "has not only expressly preempted the field of Federal election regulation, [but] has . . . created a uniform Federal regulatory scheme for the financing of Federal elections").

04005-0020/LEGAL18167914.1

after the treasurer has made his or her "best efforts" to determine its legality, the treasurer shall, within thirty days of receipt, refund the contribution.  Id.  If the treasurer later discovers that contribution is illegal, he or she must refund the contribution within thirty days of the date on which the illegality was discovered.  Id. § 103.3(b)(2) .  Contributions which are illegal "on their face" because they exceed contribution limits or are from illegal sources must be either returned, redesignated or refunded within fixed time periods.  Id. § 103.3(b)(3) .  FEC regulations also detail the precise manner in which political committees must report refunds of illegal contributions.  See id. § 104.8(d)(4) .[8]

The federal regulatory scheme instructs political committee treasurers on how to assess the legality of contributions in accordance with FECA and sets the conditions and timetable for each contribution refund.  It therefore leaves no room for additional mandatory refunds at the behest of state law plaintiffs.  Federal law enumerates the what, why, how and when of illegal contributions, preempting Plaintiff's attempt to impose additional circumstances under which the Committees must identify political contributions as illegal and disgorge them.

### 4.     BCRA Provided An Exclusive Statutory Process to Dispose of "Soft Money" Contributions.

In the eyes of federal election law, not all monetary contributions are created equal. Rather, federal law strictly regulates how each category of funds may be raised and spent.  The law distinguishes between "hard money" contributions that are subject to FECA's disclosure requirements and source and amount limitations, and "nonfederal money" or "soft money" contributions, which, prior to the enactment of BCRA, were left unregulated by FECA requirements other than disclosure.  McConnell v. FEC, 540 U.S. 93, 122 (2003), overruled in

---

[8] FEC regulations further set a fixed timetable by which a federal candidate must dispose of funds raised for the general election if he or she fails to qualify for the general election.  See 11 C.F.R. § 102.9(e).

part on other grounds, Citizens United v. FEC, 130 S. Ct. 876 (2010).  While hard money was used to influence elections for federal office, soft money was used by political parties for activities intended to influence state or local elections.  Id.  Before enactment of BCRA, the FEC allowed political parties to fund mixed-purpose activities with soft money.  Id. at 123.  "As the permissible uses of soft money expanded, the amount of soft money raised and spent by the national political parties increased exponentially."  Id. at 124; see also Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 406 (2000) ("Soft money [could] be contributed to political parties in unlimited amounts . . . .").

In 2002, Congress enacted BCRA, popularly known as the McCain–Feingold Act, to "plug the soft-money loophole."  McConnell, 540 U.S. at 133.  BCRA "regulates the use of soft money by political parties, officeholders, and candidates."  Id. at 94.  The "cornerstone" of BCRA "prohibits national party committees and their agents from soliciting, receiving, directing, or spending any soft money."  Id. (citing 2 U.S.C. § 441i(a)).  Thus, as of November 6, 2002, the date BCRA went into effect, soft money contributions to national party committees were prohibited by federal law.  National party committees like the DSCC and DCCC were required to purge their soft money by December 31, 2002.  See BCRA, Pub. L. No. 107-155, § 402(b)(2)(B)(i), 116 Stat. 81, 113 (2002); 11 C.F.R. § 300.12(a).

Nearly all of the transfers at issue in this case were soft money contributions made prior to the enactment of BCRA.  Because any amounts contributed by corporations before November 6, 2002 were not subject to FECA contribution limits, all transfers made by SFG to the Committees were soft money contributions.  See 2 U.S.C. § 441b(a); BCRA § 101(a)(1), 116 Stat. at 82.  In addition, all of Mr. Stanford's contributions made before November 6, 2002 that exceeded $20,000 in a calendar year were nonfederal funds later prohibited by BCRA.  See

- 17 -

BCRA § 307(a), 116 Stat. at 102; id. § 323(a)(1), 116 Stat. at 82.  This encompasses $1,040,500 out of the $1,150,500 in fraudulent transfers Plaintiff alleges.  See Compl. app. at 1-2. Therefore, BCRA specifically addressed the majority of the funds Plaintiff seeks to disgorge from the Committees.

BCRA prescribed specific, exclusive rules for how national party committees could spend those soft money contributions after November 6, 2002.  BCRA § 402(b)(2), 116 Stat. at 113.  A national party committee could use those funds "*solely for the purpose* of – (I) retiring outstanding debts or obligations that were incurred solely in connection with an election held prior to November 6, 2002; or (II) paying expenses or retiring outstanding debts or paying for obligations that were incurred solely in connection with any runoff election, recount, or election contest resulting from an election held prior to November 6, 2002."  Id. § 402(b)(2)(B)(i), 116 Stat. at 113 (emphasis added); see also 11 C.F.R. § 300.12(a).  The transfers at issue were thus specifically targeted by BCRA, which mandated that the Committees use them only in the manner prescribed by law.  Plaintiff's attempt to craft another use for those funds is preempted by federal law.  Because federal law dictated when and how money received from the Stanford Defendants could be disposed of, Plaintiff's state law claim that he is now entitled to those funds is preempted.

**D.      Dismissal Should Be With Prejudice.**

A complaint should be dismissed with prejudice when its defects are incurable.  Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).  Here, it would be futile to allow Plaintiff to amend his Complaint because no factual allegations can cure his failure to file within the statutory time limitations, and no repleading can overcome FECA's broad preemption of Plaintiff's state law claim.

## IV.    CONCLUSION

For the foregoing reasons, the Committees respectfully submit that their motion to dismiss should be granted and Plaintiff's Complaint dismissed in its entirety.

Dated:  April 23, 2010                                  Respectfully submitted,


/s/ Marc Erik Elias
Marc Erik Elias (*pro hac vice*)
Brian G. Svoboda (*pro hac vice*)
**Perkins Coie LLP**
607 Fourteenth Street N.W.
Washington, D.C.  20005-2003
[Tel.]: (202) 628-6600
[Fax]: (202) 434-1690
Email: MElias@perkinscoie.com
Email: BSvoboda@perkinscoie.com

Robert P. Latham
Texas State Bar No. 11975500
Matt C. Acosta
Texas State Bar No. 24062577
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
[Tel.]: (214) 953-6000
[Fax]: (214) 661-6607
Email: blatham@jw.com
Email: macosta@jw.com

*Attorneys for Defendants*
*Democratic Senatorial Campaign Committee,*
*Inc. and Democratic Congressional Campaign*
*Committee, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of April, 2010, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, and that I have served all counsel of record electronically.

 /s/ Matt C. Acosta_____
Matt C. Acosta