IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0346-N |
| | § | |
| DEMOCRATIC SENATORIAL | § | |
| CAMPAIGN COMMITTEE, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

This Order addresses Defendants the Democratic Senatorial Campaign Committee,
Inc. ("DSCC"), and the Democratic Congressional Campaign Committee, Inc.'s ("DCCC"),
(collectively, the "Democratic Committees") motion to dismiss [19], and Defendants the
National Republican Congressional Committee ("NRCC"), the National Republican
Senatorial Committee ("NRSC"), and the Republican National Committee's ("RNC")
(collectively, the "Republican Committees" and, together with the Democratic Committees,
the "Political Committees") motion to dismiss [16] and motion for summary judgment [91],
as well as the Receiver's motion for summary judgment [36].  For the reasons that follow,
the Court denies the Political Committees' motions to dismiss, denies the Republican
Committees' motion for summary judgment, and grants the Receiver's motion for summary
judgment.

## I. ORIGINS OF THE RECEIVER'S FRAUDULENT TRANSFER CLAIMS

This dispute presents another episode related to the Securities and Exchange Commission's (the "SEC") ongoing securities fraud action against R. Allen Stanford, his associates, and various entities under Stanford's control (the "Stanford Defendants"). As part of that litigation, this Court "assume[d] exclusive jurisdiction and t[ook] possession of the" "Receivership Assets" and "Receivership Records" (collectively, the "Receivership Estate"). *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"), *in SEC v. Stanford Int'l Bank, Ltd.*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009). The Court appointed Ralph S. Janvey to serve as Receiver of the Receivership Estate and vested him with "the full power of an equity receiver under common law as well as such powers as are enumerated" in the Receivership Order. *Id.* at 3.

Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. Additionally, the Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *Id.* at 5.

Pursuant to those powers, the Receiver filed this fraudulent transfer suit to recover approximately $1.6 million in contributions made by R. Allen Stanford, James Davis, and the Stanford Financial Group Company ("SFGC") to the Political Committees over a period of about eight years.  The parties agree that the Stanford Defendants allocated their contributions as follows: $950,500 to the DSCC; $200,000 to the DCCC; $238,500 to the NRCC; $83,345 to the NRSC; and $128,500 to the RNC.  *See, e.g.*, Compl. at 7 [1].  Nothing suggests that the Political Committees acted in bad faith.  But, according to the Receiver, the Political Committees nonetheless must disgorge an amount equal to the contributions because they received Ponzi scheme proceeds without providing consideration of reasonably equivalent value in exchange.  The Receiver now moves for summary judgment.

The Political Committees raise two primary objections to the Receiver's claims.  First, the Political Committees argue that the Receiver untimely filed this action.  Because Texas courts treat the time-bar provisions of the Texas Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COM. CODE § 24.001, *et seq.*, as a statute of repose rather than a statute of limitations, the Political Committees contend that the Receiver cannot rely on equitable tolling doctrines to establish that he timely brought suit.  Second, the Political Committees argue that federal campaign finance laws preempt the Receiver's claims.  *See* Federal Election Campaign Act of 1971 ("FECA"), Pub. L. 92-225, 86 Stat. 3 (1972) (codified as amended at 2 U.S.C. § 431, *et seq.*); Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107-155, 116 Stat. 81 (2002) (codified in scattered sections of FECA), *abrogated in part by Citizens United v. FEC*, 130 S. Ct. 876 (2010), *and by FEC v.*

*Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007).  The Republican Committees move for summary judgment on these two defenses, which the Court analyzes in turn before addressing the Receiver's motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD[1]

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Courts, however, need not sift through the record in search of triable issues.  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden.  *Douglass v. United Servs. Auto. Ass'n*,

---

[1]The Republican Committees' motion for summary judgment raises the same arguments presented in the Political Committees' motions to dismiss.  The Court's analysis of the parties' cross-motions for summary judgment also disposes of the Political Committees' motions to dismiss.

79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).  Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'"  *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. TEXAS FRAUDULENT TRANSFER LAW DOES NOT "EXTINGUISH" THIS ACTION

The Court first addresses the Political Committees' argument that TUFTA's limitations provision "extinguished" the Receiver's cause of action prior to filing.  In general, TUFTA operates to void certain fraudulent "transfers," which the statute defines in relevant part as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money."  TEX. BUS. & COM. CODE § 24.002(12).[2]  TUFTA considers several types of transfers to be fraudulent.  *See id.* §§ 24.005(a) (three types); 24.006 (two types).  Despite some ambiguity in the Receiver's complaint, the parties agree that this dispute concerns only one type of fraudulent transfer.  *See, e.g.*, Democratic Committees' Mot. to Dismiss Br. at 5 n.2 [19-1].

The Receiver brings his claim under section 24.005(a)(1), which provides that a transfer "is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made

---

[2]Because the parties assume that Texas law controls here, the Court will not second guess their choice.

the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."  "In determining [a debtor's] actual intent," courts may consider, "among other factors[,] . . . whether . . . the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred" and if "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred."  *Id.* § 24.005(b)(8) & (b)(9).  Notably, TUFTA considers a debtor to be insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  *Id.* § 24.003(a).

As the Political Committees point out, TUFTA does not preserve indefinitely a plaintiff's cause of action.  TUFTA "extinguish[es]" claims brought under section 24.005(a)(1) unless filed "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  *Id.* § 24.010(a)(1).  Because the Receiver almost exclusively seeks the return of funds contributed to the Political Committees more than four years before his appointment, the parties agree that the Receiver timely filed suit only if he did so within the "discovery rule" in section 24.010(a)(1)'s second clause.[3]  *Cadle Co. v. Wilson*, 136 S.W.3d 345, 350 (Tex. App. – Austin 2004, no pet.) ("It is clear from the text of the statute that the legislature has chosen to preserve application of the discovery rule to

---

[3]"The discovery rule defers the accrual of a cause of action until the plaintiff knew or, through the exercise of reasonable diligence, should have known of the facts giving rise to the cause of action."  *Cadle Company*, 136 S.W.3d at 350 (citing *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455-56 (Tex. 1996).

some extent within the provisions of TUFTA."); *Johnston v. Crook*, 93 S.W.3d 263, 270 (Tex. App. – Houston [14th Dist.] 2002, pet. den.) ("[T]he [Texas] UFTA specifically acknowledges the availability of the discovery rule to cases of transfers made with actual intent to defraud.").

The Political Committees contend, for a variety of reasons stemming from TUFTA's alleged status as a statute of repose,[4] that the Receiver did not timely file. First, the Political Committees posit that, because the Receiver stands in place of the Stanford Defendants, his claims were discovered the moment the Stanford Defendants made each contribution. Under this view, the Texas legislature's intentional crafting of TUFTA as a statute of repose effectively exempts it from traditional equitable tolling doctrines that might otherwise salvage the Receiver's claims.[5] Thus, according to the Political Committees, the Stanford

---

[4]The Supreme Court of Texas recently distinguished statutes of repose from statutes of limitation as follows:

> Statutes of repose typically provide a definitive date beyond which an action cannot be filed. Unlike traditional limitations provisions, which begin running upon accrual of a cause of action, a statute of repose runs from a specified date without regard to accrual of any cause of action. Repose then differs from limitations in that repose not only cuts off rights of action after they accrue, but can cut off rights of action before they accrue. And while statutes of limitations operate procedurally to bar the enforcement of a right, a statute of repose takes away the right altogether, creating a substantive right to be free of liability after a specified time. Thus, the purpose of a statute of repose is to provide absolute protection to certain parties from the burden of indefinite potential liability.

*Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 866 (Tex. 2009) (internal citations and quotation marks omitted).

[5]Although the Supreme Court of Texas has yet to rule on the issue, *see Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 676 (S.D. Tex. 2007), the few Texas intermediate appellate courts to expressly consider the matter view the time-bar provision as a statute of

Defendants' actual knowledge of their contributions' fraudulent origins extinguished the Receiver's claims well before his appointment. *See, e.g.*, Republican Committees' Mot. to Dismiss Br. at 6-7 [17]; Democratic Committees' Mot. to Dismiss Br. at 7-8.

In the alternative, the Political Committees argue second that, even if TUFTA's extinguishment provision operated as a statute of limitations that allowed equitable tolling, the Receiver should have filed his complaint no later than the first anniversary of his appointment, or February 16, 2010. *See* Order Appointing Receiver [10], *in SEC v. Stanford Int'l Bank*, Civil Action No. 3:09-CV-0298-N. This theory holds that the Receiver, in a singularity-like moment, inherited the Stanford Defendants' actual knowledge of the contributions immediately upon his appointment. *See, e.g.*, Republican Committees' Mot. to Dismiss Br. at 7-9; Democratic Committees' Mot. to Dismiss Br. at 8-9. Finally, the Political Committees assert that the Receiver, simply by exercising reasonable diligence,

---

repose. *See Cadle Company*, 136 S.W.3d at 350; *Duran v. Henderson*, 71 S.W.3d 833, 838 (Tex. App. – Texarkana 2002, pet. den.) ("The drafters of the original UFTA intended that the extinguishment provision be enforced as a statute of repose rather than as a traditional waiveable statute of limitations."). Other Texas appellate courts have identified the provision as a statute of repose, but some do refer to it as a statute of limitations. The latter, however, use the term "limitations" generically to reference the period of time in which a plaintiff may bring a cause of action. *See, e.g.*, *Walker v. Anderson*, 232 S.W.3d 899 (Tex. App. – Dallas 2007, no pet.) (repose); *Flores v. Ontiveros*, 218 S.W.3d 98 (Tex. App. – Corpus Christi 2005, pet. dism'd) (limitations), *aff'd in part, rev'd in part on other grounds sub nom. Ontiveros v. Flores*, 218 S.W.3d 70 (Tex. 2007); *Crook*, 93 S.W.3d 263 (limitations).

The federal courts follow the same practice. *See, e.g.*, *In re Supplement Spot, LLC*, 409 B.R. 187 (Bankr. S.D. Tex. 2009) (repose); *In re Moore*, 379 B.R. 284 (Bankr. N.D. Tex. 2007) (limitations). But, the federal courts citing the most on point Texas caselaw, *Cadle Company* and *Duran*, almost uniformly identify the provision as a statute of repose. *See, e.g.*, *American Founders*, 365 B.R. 647. As explained below, the Court finds the issue irrelevant because the Political Committees first two objections depend on the (incorrect) theory that the Receiver stands only in the Stanford Defendants' shoes.

could have discovered the contributions in the three-day window between the date of his

appointment and February 19, 2009, the date one year prior to the date he filed suit.  *See, e.g.*,

Democratic Committees' Mot. to Dismiss Br. at 9-11; Republican Committees' Summ. J.

Reply at 7 [98].  The Court addresses each of these objections in turn.

### A. TUFTA's Discovery Rule Applies to the Receiver's Claims

The Political Committees' first two objections assume that only the Court's use of

equitable tolling, specifically the doctrine of adverse domination, may bring the Receiver's

claims within the ambit of TUFTA's discovery rule.  "Under the common law doctrine of

adverse domination, the statute of limitations for an entity's claim is tolled when the entity

is controlled or dominated by individuals engaged in conduct that is harmful to the entity."

*Warfield v. Carnie*, 2007 WL 1112591, at *15 (N.D. Tex. 2007) (Buchmeyer, J.) (citing,

*inter alia*, *FDIC v. Dawson*, 4 F.3d 1303 (5th Cir. 1993)).  If TUFTA operates as a statute

of repose, the argument goes, it renders unavailable adverse domination as a way to void the

Stanford Defendants' *ab initio* knowledge of the contributions' fraudulent nature.

The viability of the Receiver's claims, however, does not hinge on equitable tolling.

As an initial matter, the Political Committees overlook the possibility that adverse

domination has relevance here beyond its potential deployment as an equitable tolling

mechanism.   The Court declines to venture an *Erie* guess on whether TUFTA's

extinguishment provision operates as a statute of repose or limitations.  Even if it is a statute

of repose,[6] the plain language of the subsection applicable to the Receiver's claims preserves

---

[6]Although the Court refrains from deciding the issue, it notes that TUFTA contains at least two provisions that create considerable tension with its ostensibly repose-related goals. First, section 24.010(a)(1)'s discovery rule creates the possibility of indefinite liability for at least some claims brought under TUFTA, something the Supreme Court of Texas considers "clearly incompatible with the purpose" underlying statutes of repose. *Galbraith Engineering*, 290 S.W.3d at 869 (ruling that the term "limitations" in section 33.004 of the Texas Civil Practice and Remedies Code did not extend to statutes of repose "[b]ecause application of the revival statute in [that] instance effectively [would have] render[ed] the period of repose indefinite"). Query, then, whether the *Cadle Company* and *Duran* courts were correct in assuming that, by titling section 24.010 "Extinguishment of Cause of Action," the Texas Legislature intended for every subsection of section 24.010 to operate as a statute of repose.

Second, TUFTA expressly provides creditors with potentially expansive equitable remedies. *See* TEX. BUS. & COM. CODE § 24.008(a)(3) (providing that "subject to applicable principles of equity and in accordance with applicable rules of civil procedure" TUFTA claimants may obtain injunctive relief, the appointment of a receiver, or "any other relief the circumstances may require"). Although not incompatible with viewing section 24.010 as a statute of repose in toto, this does counsel against reading in an intent on the part of the Texas Legislature to inhibit courts' recourse to equitable principles when deciding TUFTA cases. Indeed, the Texas Legislature adopted the Uniform Fraudulent Transfer Act's "Supplementary Provisions" section wholesale. *See* TEX. BUS. & COM. CODE § 24.011 ("Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions."); Unif. Fraudulent Transfer Act § 10 (1984) (same, except that Texas uses "chapter" in place of "Act"). Because nothing in section 24.010 explicitly "displaces" equitable principles, it is not at all clear that applying equitable doctrines like adverse domination to section 24.010(a)(1) would constitute an impermissible "elevat[ion] [of] the Court's own judgment regarding equity above the Texas State Legislature's, [as] embodied by the plain-language of the statute." *In re IFS Fin. Corp.*, 417 B.R. 419, 447-48 (Bankr. S.D. Tex. 2009); *cf. Young v. United States*, 535 U.S. 43, 49 (2002) (noting that "limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute") (internal citations and quotation marks omitted).

As the statute itself makes clear, moreover, the Texas Legislature adopted TUFTA with the specific purpose that it be applied uniformly with other states' versions of the Act. *See* TEX. BUS. & COM. CODE § 24.012 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."). Other courts, it turns out, have used adverse domination

---

the discovery rule. And, when "the discovery rule is explicitly available by statute . . . the [Texas Supreme] court's [common law] 'inherently undiscoverable' analysis, which focuses on a plaintiff's exercise of reasonable diligence," applies because it "is relevant to the statutory issue . . . of when [the] transfer *could reasonably have been* discovered." *Cadle Company*, 136 S.W.3d at 351 (citing TEX. BUS. & COM. CODE § 24.010(a)(1)) (emphasis in original). Thus, R. Allen Stanford and his associates' adverse domination of the numerous Stanford enterprises may serve as a conceptual factor in establishing the reasonableness of the Receiver's delay in discovering the contributions; the Court is not constrained to use solely adverse domination as a tool to allow a claim to proceed when the Texas Legislature allegedly has provided to the contrary.

More importantly, the Political Committees' first two objections depend on a cramped – and recently rejected – interpretation of the Receiver's authority to bring claims besides those available to the Stanford Defendants. The Fifth Circuit recently held in another asset-recovery case that the Receiver may stand in the shoes of the Stanford Defendants and also represent defrauded creditors in their recovery efforts. *See Janvey v. Alguire*, 628 F.3d 164, 183 (5th Cir. 2010) (noting that receivers are "legal hybrids" who "'stand[] in the shoes of

---

in the context of similar UFTA statutes. *See, e.g.*, *Wing v. Kendrick*, 2009 WL 1362383, at *3 (D. Utah 2009) (Utah UFTA) (citing similar holding in *Quilling v. Cristell*, 2006 WL 316981, at *6 (W.D.N.C. 2006)); *Carnie*, 2007 WL 1112591, at *15-19 (Washington State UFTA). Indeed, as a matter of "[c]ommon sense and . . . statutory purpose," the Washington Supreme Court overruled an intermediate appellate court's construction of the Washington State UFTA as a statute of repose. *Freitag v. McGhie*, 947 P.2d 1186, 1189-90 (Wash. 1997) ("[N]othing in the UFTA leads us to conclude that the UFTA sought to eliminate the common law and the former UFCA [discovery] rule that a claimant have knowledge of the fraudulent nature of a transfer before the statute of limitations begins to run.").

the person for whom [they] ha[ve] been appointed,'" serve as "'instrument[s] of the court . . . acting also for the stockholders . . . and creditors of the corporation,'" and "are imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner" (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 89 (2d Cir. 1983); *Drennen v. S. States Fire Ins. Co.*, 252 F. 776, 788 (5th Cir. 1918))).  Indeed, the Fifth Circuit explicitly held that the Receiver has standing to bring creditors' TUFTA claims. *Alguire*, 628 F.3d at 184-85.

The discovery rule's application here thus turns on whether the facts giving rise to the Receiver's claims were inherently undiscoverable to the Stanford Defendants' creditors; when the Stanford Defendants obtained knowledge of the contributions is irrelevant.  *Cf. Cadle Company*, 136 S.W.3d at 350 ("The discovery rule defers the accrual of a cause of action until *the plaintiff* knew or, through the exercise of reasonable diligence, should have known of the facts giving rise to the cause of action.") (emphasis added) (citations omitted); *Crook*, 93 S.W.3d at 271-273 (rejecting TUFTA defendant's attempt to overturn trial court's denial of summary judgment because the defendant "did not conclusively establish when [the] *Receiver* knew or should have known about the allegedly fraudulent transfer" (citing *Eckert v. Wendel*, 40 S.W.2d 796, 797 (Tex. 1931))) (emphasis added); *Duran*, 71 S.W.3d at 839 ("A creditor's cause of action to set aside a fraudulent conveyance accrues when *the*

*creditor* acquires knowledge of the fraud, or would have acquired such knowledge in the exercise of ordinary care." (citing *Eckert*, 40 S.W.2d 796)) (emphasis added).[7]

Texas courts generally apply the discovery rule when "the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified." *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996). "Requiring [both elements] assures that the policy underpinnings of statutes of limitations are met – balancing the possibility of stale or fraudulent claims against individual injustice." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 457 (Tex. 1996). Under Texas law, "[a]n injury is inherently undiscoverable if it is by nature the type of injury that is unlikely to be discovered within the prescribed limitations period despite due diligence." *Cadle Company*, 136 S.W.3d at 351 (citing *S.V.*, 933 S.W.2d at 7; *Altai*, 918 S.W.2d at 456). The Court has not found a succinct statement of the objective verifiability element, but it appears to block plaintiffs from avoiding statutes of limitation merely to present claims that, although undiscoverable during the limitations period, require resolution of "a swearing match between parties over facts and between experts over opinions." *S.V.*, 933 S.W.2d at 15. In general, plaintiffs satisfy the objective verifiability element when evidence of "the alleged injury [is] indisputable," *id.* at 7, or established by "recognized expert opinion on a particular subject [that is] so near consensus that, in conjunction with objective evidence not based on the plaintiff's assertions," the Court may presume the injury occurred. *Id.* at 15. Over time, the

---

[7]*See also Eckert*, 40 S.W.2d at 797 ("The creditor's cause of action to annul a fraudulent conveyance accrues when the creditor acquires knowledge of the fraud or would have acquired such knowledge in the exercise of ordinary care.").

Supreme Court of Texas "has narrowed application of the discovery rule to a class of cases in which the injury was so concealed as to be effectively undetectable by the claimant without some type of expertise, or at least until the harm was already done." *Cadle Company*, 136 S.W.3d at 351 (collecting cases).

The facts underlying the Receiver's claims were inherently undiscoverable to the Stanford Defendants' creditors, and the creditors' injuries are objectively verifiable. Even if the Stanford Defendants' contributions were publicly disclosed, the possibility that the Stanford Defendants essentially funneled their creditors' money to the Political Committees through an elaborate Ponzi scheme was not. The Stanford Defendants' creditors would have had notice of that only after the Receiver's appointment.[8] And, although the Receiver brings claims based on contributions made approximately a decade ago, the Receiver presents his forensic accountant's objectively verifiable – and uncontradicted – evidence showing that the Stanford Defendants operated a Ponzi scheme.[9] The Political Committees admit

---

[8]*Cf. Cadle Company*, 136 S.W.3d at 353 (declining to apply section 24.010(a)(1) when the plaintiff "should have discovered the *fraudulent nature* of the transfer within a year after it first learned of [the transfer's] existence") (emphasis added). Uncovering the fraudulent nature of the Stanford Defendants' scheme would have required the creditors to discover, among other things, the Stanford entities' insolvency. *See* TEX. BUS. & COM. CODE § 24.005(b)(9); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (observing that Ponzi schemes are, "as a matter of law, insolvent from [their] inception" (citing *Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924))). As the extensive use of forensic accounting in the Stanford litigation demonstrates, the creditors could not have made that discovery "without some type of expertise." *Cadle Company*, 136 S.W.3d at 351.

[9]*See* Receiver's Summ. J. App. Ex. 2 (forensic accountant's report) [hereinafter "Van Tassel Decl."] [37].

> [M]y findings are consistent with the SEC's allegations and James Davis's admission that the Stanford enterprise was a Ponzi scheme. [Stanford

> International Bank, Ltd., ("SIB")] was insolvent . . . from at least 2004 and
> probably for much longer, yet it continued selling CDs to the end. . . . . The
> Stanford Ponzi scheme could only be continued by selling yet more CDs and
> using the proceeds to pay redemptions, interest and operating expenses.
> Significant sums were also diverted to finance Allen Stanford's opulent life
> style of yachts, jet planes, travel, multiple homes, company credit cards, etc.
> Davis . . . and other insiders were paid handsomely for their complicity. . . . .
> James Davis admitted in his rearraignment that the Stanford enterprise was a
> Ponzi scheme from the beginning, and I have not seen anything in the records
> I have reviewed to indicate otherwise.

Van Tassel Decl. at 4-5 (App. at 37-38).   Among other things, Van Tassel drew her conclusions from objectively verifiable Stanford entity, customer, and third party records, worksheets, and databases "using reliable practices and methodologies that are standard in the fields of accounting and finance." *Id.* at 3-4 (App. at 36-37).   In particular, Van Tassel's investigation discovered SIB worksheets designed to "reverse engineer" desired revenue levels by giving "fictitious revenue amounts to each category . . . of a fictitious investment allocation." *Id.* at 7 (App. at 40).

The Court overrules the various objections to the Receiver's summary judgment evidence. Davis's guilty plea constitutes admissible evidence that Van Tassel may rely upon even if hearsay. *See* FED. R. EVID. 807, 803(22), & 703; *In re Slatkin*, 525 F.3d 805, 812-13 (9th Cir. 2008) (holding that Ponzi schemer's plea was admissible under Federal Rule of Evidence 807 and, accordingly, that district court did not abuse its discretion in considering the plea as summary judgment evidence); *First Nat'l Bank of Louisville v. Lustig*, 96 F.3d 1554, 1576 (5th Cir. 1996) ("Experts may rely on hearsay evidence in forming their opinions." (citing *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1309 (5th Cir. 1991))).

Van Tassel later supplemented her report, "[b]ased on [her] continued investigation." App. to Receiver's Opp. to Republican's Mot. for Summ. J. at 5 [hereinafter "Van Tassel Supp. Decl."] [94-1].  Among other things, she revised her conclusion concerning the length of time the Stanford Defendants operated a Ponzi scheme from 2004 to 1999 and determined that: (1) "SIB was insolvent . . . from at least 1999 forward," (2) R. Allen Stanford's income was derived "almost exclusively from the Stanford Entities, including proceeds from SIB CDs," and (3) "SFGC was insolvent . . . from at least 2000 and received SIB CD funds." *Id.*

Although the Court denied the Republican Committees' motion to strike Van Tassel's Supplemental Declaration, it granted the Republican Committees leave to file a supplemental response.  In it, the Republican Committees maintain their objections. *See, e.g.*, Republican Committees' Supp. Reply Br. at 1 n.1 [105]. The Court, however, overrules those objections, too. *See, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 491 F. Supp. 2d 690, 704-05 (S.D. Tex. 2007) ("[A] district court may rely on arguments and evidence presented for the first time in a reply brief as long as the court gives the nonmovant an adequate opportunity to respond." (quoting *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 & n.10 (5th Cir.

receiving the contributions and provide no evidence that the Stanford Defendants'
contributions were derived from untainted funds.[10]   Under these circumstances, the Court
holds that the fraudulent transfers and the creditors' resulting injuries "were inherently
undiscoverable at the time they occurred" and are backed by "objectively verified"
information.  *S.V.*, 933 S.W.2d at 6.  Accordingly, TUFTA's discovery rule applies to the
Receiver's claims, and the Political Committees' first two objections fail as a matter of law.

### B. The Receiver Filed Within the Discovery Rule Period as a Matter of Law

"A defendant moving for summary judgment on the affirmative defense of limitations
has the burden to establish that defense conclusively."  *Cadle Company*, 136 S.W.3d at 352
(citing *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748
(Tex. 1999)).  To prevail, "the defendant must (1) conclusively prove when the cause of
action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or
otherwise raised, by proving as a matter of law that there is no genuine issue of material fact
about when the plaintiff discovered, or in the exercise of reasonable diligence should have

---

2004) and collecting cases).  To the extent the Republican Committees believe Van Tassel
failed to reference certain methodologies and other material statements from her first
declaration, Van Tassel expressly incorporated into her Supplemental Declaration "[a]ll of
the opinions and statements contained" in the original. Van Tassel Supp. Decl. at 1.  The
Court therefore properly references Van Tassel's Supplemental Declaration.

[10]*See* Receiver's Summ. J. App. Exs. 3, 5-7 (Political Committees, sans NRCC,
Admissions).  The NRCC later produced evidence showing that it in fact had received the
sought-after contributions.  *See* Receiver's Summ. J. Reply App. Ex. 2 [90]. The Republican
Committees' failure to provide evidence concerning the Ponzi scheme's existence stems in
part from its decision to forego deposing Van Tassel.  *See* Receiver's Summ. J. Reply App.
Ex. 4 at 60.

discovered, the nature of its injury." *Id.* (citing *KPMG*, 988 S.W.2d at 748). "When a plaintiff knew or should have known of an injury is generally a question of fact." *Id.* (citing *Nat'l W. Life Ins. Co. v. Rowe*, 86 S.W.3d 285, 298 (Tex. App. – Austin 2002, pet. den), *rev'd on other grounds*, 164 S.W.3d 389 (Tex. 2005); *Houston Endowment, Inc.* v. *Atl. Richfield Co.*, 972 S.W.2d 156, 160 (Tex. App. – Houston [14th Dist.] 1998, no pet.)). But, "if reasonable minds could not differ about the conclusion to be drawn from the facts in the record, then the start of the limitations period may be determined as a matter of law." *Id.* at 352 (citing, *inter alia*, *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998)).

According to the Political Committees, the Receiver reasonably could have discovered the Stanford Defendants' contributions before February 19, 2009. As evidence, they point primarily to the ostensibly vast resources at the Receiver's disposal, publicly-available FEC records, and certain websites, news articles, and blogs discussing the Stanford Defendants' many campaign and other political contributions. Under this view, the Receiver untimely filed his complaint outside of section 24.010(a)(1)'s one-year window because he did not sue until February 19, 2010.

For summary judgment purposes, however, the Republican Committees fail to show conclusively when the Receiver's cause of action accrued or when he reasonably should have discovered the contributions. The Receiver avers that he did not discover the contributions until February 20, 2009. *See, e.g.*, Receiver's Resp. to Mot. to Compel at 6 [60]. The Political Committees have submitted no summary judgment evidence establishing that the

Receiver actually discovered the contributions on February 16, 17, 18, or 19.[11]  And, because the Receiver represents the Stanford Defendants' creditors in this action, no basis exists for concluding that on his appointment the Receiver acceded to the Stanford Defendants' knowledge that their contributions to the Political Committees were fraudulent.[12]  The Court thus considers only whether it was unreasonable for the Receiver to discover the Stanford Defendants' contributions as late as February 20, 2009.

The Court concludes that no reasonable minds could differ as to the timeliness of the Receiver's discovery.  It is simply unreasonable to expect the Receiver to have discovered the $1.6 million in contributions – out of a complex, long-lasting, intentionally-concealed,

---

[11]The publicly available contribution disclosures required under federal law "do not of themselves raise a presumption of constructive knowledge." *Duran*, 71 S.W.3d at 839. Such disclosures serve as "merely one circumstance bearing on the creditor's actual or presumed knowledge." *Id.* (citing *Eckert*, 40 S.W.2d 796). And, the Political Committees "present[] no argument or authorities explaining why the [Receiver] had a particular duty to investigate" FEC records or otherwise give priority to discovering the Stanford Defendants' contributions. *Id.*

[12]The Court rejects the Democratic Committees' attempts to establish constructive notice by referencing testimony at congressional hearings concerning the SEC's failure to discover the Stanford Defendants' scheme despite receiving various warnings. *See* Notice of Supp. Authorities [107]. Even on the (dubious) assumption that the Stanford Defendants' creditors possessed the requisite expertise and resources to conduct a securities fraud investigation, the Democratic Committees still fail to show how the creditors could have learned of certain SEC personnel and former Stanford insiders' suspicions that the Stanford enterprise was, in reality, a Ponzi scheme.  The Democratic Committees do not allege that the creditors had an obligation to follow Financial Industry Regulatory Authority ("FINRA") arbitration proceedings.  And even if they did, the proffered testimony establishes that FINRA "'sided with Stanford in every single . . . case,'" *id.* at 3 (quoting testimony of Charles Rawls), evidence tending to support the Stanford enterprises' veneer of legitimacy. Accordingly, the Democratic Committees' supplemental authorities do not alter the Court's concluding that the discovery rule applies here.

international scheme involving billions of dollars and myriad transactions – in less than four days. Under the circumstances, the Receiver reasonably might have taken longer. TUFTA requires only the exercise of reasonable diligence, not omniscience.[13] The Political Committees' limitations defenses thus fail as a matter of law. Accordingly, the Court declines to dismiss the Receiver's claims or to grant summary judgment in favor of the Republican Committees on limitations grounds.

## IV. FECA DOES NOT PREEMPT THE RECEIVER'S CLAIMS

The Republican Committees next move for summary judgment on the admittedly "novel" grounds that federal election laws preempt the Receiver's state law fraudulent transfer claims.[14] Republican Committees' Summ. J. Reply Br. at 5. As the Republican Committees note, courts have not "squarely addressed" this argument. *Id.* Nonetheless, preemption caselaw and the relevant campaign finance statutes provide sufficient guidance to conclude that the Political Committees contentions fail as a matter of law.

The Political Committees argue broadly that FECA, BCRA, and their associated regulations "expressly preempt state law and comprehensively address what contributions are illegal, how the national committees are to handle illegal contributions, and when and

---

[13]Nor does it require clairvoyance, as the Republican Committees suggest by referencing the Receiver's pre-appointment communications with the SEC. Republican Committees' Supp. Reply Br. at 7. The proffered deposition testimony fails to show that the Receiver could have learned of the Political Committees' contributions from those discussions, *see* Republican Committees' Supp. Reply App. (Janvey Dep.) [106], and the Receiver lacked access to the Stanford Defendants' records prior to his appointment.

[14]The Democratic Committees raise the same arguments in their motion to dismiss.

how nonfederal contributions received by national political committees were to be disgorged."  Republican Committees' Summ. J. Br. at 3 [91-1].  According to the Political Committees, the Receiver's TUFTA claims also "infringe on the domain set forth by Congress and the FEC" because, "even if [TUFTA's] purpose is completely unrelated to elections . . . , as applied, [it] encroach[es] on federal law" by effectively appending Ponzi scheme-derived contributions to FECA's "comprehensive" – and therefore exclusive – "list of prohibited contributions."  *Id.* at 4.  Combined with a "regulatory scheme [that also] instructs political committee treasurers on how to assess the legality of contributions . . . and sets the conditions and timetable of each contribution refund," federal law simply "leaves no room for additional 'avoidance' at the behest of state law plaintiffs."  *Id.* at 6.  And, finally, because the Stanford Defendants' made primarily "soft money" contributions, the Political Committees contend that honoring the Receiver's request would "breach the long-standing principle of separating 'soft money' from 'hard money' . . . at the core of the FECA" by requiring the disgorgement of a now-prohibited type of contribution for which Congress provided two "sole" means of disposal.  *Id.* at 8 (emphasis removed).

### A. *Preemption Principles*

Because "[a] fundamental principle of the Constitution is that Congress has the power to preempt state law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted), discerning and effectuating "'[t]he purpose of Congress is the ultimate touchstone' of pre-emption analysis."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (alteration in original) (quoting rule first articulated in *Retail Clerks v. Schermerhorn*,

375 U.S. 96, 103 (1963)).  To that end, courts look to "the language of the pre-emption statute and the statutory framework surrounding it" as well as "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect" interested parties.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (internal citations and quotation marks omitted).  Federalism dictates, and courts "have long presumed[,] that Congress does not cavalierly pre-empt state-law causes of action."  *Lohr*, 518 U.S. at 485; *see also Altria Grp., Inc. v. Good*, 555 U.S. 70, 129 S. Ct. 535, 543 (2008) (discussing presumption against preemption (citing, *inter alia*, *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)));[15] *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280 (5th Cir. 1994) (noting that the presumption is "strong") (citation and internal quotation marks omitted).

Explicit statutory or regulatory language provides the clearest expression of preemptive intent.  *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990); *Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 713 (1985) (acknowledging and citing authorities holding that "state laws can be pre-empted by federal regulations as well as by federal statutes").  But, federal law also may preempt state law impliedly "[w]hen Congress intends federal law to occupy the field" regulated by the statute or "to the extent" state law creates "any conflict with a federal statute."  *Crosby*, 530 U.S. at 372 (internal quotation

---

[15]Because pagination for the United States Reports remains unavailable, the Court will use the Supreme Court Reporter when citing *Altria*.

marks and citations omitted).  Although not "rigidly distinct" conceptually, courts generally refer to these three broad categories as express, field, and conflict (or obstacle) preemption. *English*, 496 U.S. at 79 n.5.  The Political Committees raise preemption arguments under all three varieties.

### B. The Court Narrowly Construes FECA's Express Preemption Provision

"When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation."  *Cipollone*, 505 U.S. at 517 (internal quotation marks and citations omitted).  "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading," however, "courts ordinarily accept the reading that disfavors pre-emption." *Altria*, 129 S. Ct. at 543 (internal quotation marks and citation omitted).  Because express and field preemption often operate "no different[ly] in practice," in many FECA cases "[t]he only real issue" for the court to determine "is the [preemption provision's] effective reach." *Teper v. Miller*, 82 F.3d 989, 994 n.5 (11th Cir. 1996).  Here, the Court analyzes the Political Committees' express and field preemption arguments separately.

### 1. FECA's Plain Text Does Not Expressly Preempt the Receiver's Claims. — FECA

expressly "supersede[s] and preempt[s] any provision of State law with respect to election to Federal office."  2 U.S.C. § 453(a).  As several courts have noted, section 453's plain text supports more than one plausible reading.  *See, e.g.*, *Weber v. Heaney*, 995 F.2d 872, 875

(8th Cir. 1993) ("We recognize that § 453 is subject to more than one reading, and the areas preempted may vary with different readings." (citing *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 545 (8th Cir. 1984))).

Given the background assumption against preemption of state law causes of action, the Court – in line with long-standing precedent – reads section 453 to allow the Receiver's claims.[16]   Although section 453 contains expansive "any provision" language, it simultaneously limits FECA's preemptive reach with the restrictive modifier "with respect to." Unlike the phrase "relating to," which the Supreme Court has found "synonymous with 'having a connection with,'" *Altria*, 129 S. Ct. at 548 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)),[17] "with respect to," like the phrase "'based on,'" "'indicates a but-for causal relationship and thus a necessary logical condition'" generally incompatible with broad preemptive intent. *Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007)).   Narrowly construed, then, FECA preempts only those State laws that regulate directly, either facially or as applied, "election to Federal office."

---

[16]"[C]ourts have given section 453 a narrow preemptive effect in light of its legislative history."  *Karl Rove*, 39 F.3d at 1280 & n.18 (citation omitted) (collecting cases); *see also Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475 & n.3 (2d Cir. 1991) ("The narrow wording of [section 453] suggests that Congress did not intend to preempt state regulation with respect to non-election-related activities." (analogizing section 453 to [the Employee Retirement Income Security Act of 1974's ("ERISA"), 29 U.S.C. § 1144(a),] preemption provision and citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7-8 (1987))).

[17]In *Morales*, the Supreme Court, "[r]elying on precedents construing the pre-emptive effect of ['relating to'] in [ERISA], . . . concluded that the phrase 'relating to' [in the Airline Deregulation Act of 1978, 49 App. U.S.C. § 1305(a)(1)] indicate[d] Congress' intent to pre-empt a large area of state law to further [the statute's] purpose." *Altria*, 129 S. Ct. at 548 (citing 504 U.S. at 383-84).

A plain reading, however, must also take into account that FECA uses "election"and

"Federal office" as terms of art.  FECA defines "election" as

> (A) a general, special, primary, or runoff election; (B) a convention or caucus
> of a political party which has authority to nominate a candidate; (C) a primary
> election held for the selection of delegates to a national nominating convention
> of a political party; and (D) a primary election held for the expression of a
> preference for the nomination of individuals for election to the office of
> President.

2 U.S.C. § 431(1).  FECA provides that "[t]he term 'Federal office' means the office of

President or Vice President, or of Senator or Representative in, or Delegate or Resident

Commissioner to, the Congress." 2 U.S.C. § 431(3). FECA also contains specific definitions

for the terms "contribution" and "expenditure" that limit their application to uses "made . . .

for the purpose of influencing any election for Federal office."  2 U.S.C. §§ 431(8)(A)

("contribution") & 431(9)(A) ("expenditure").

These definitions demonstrate that TUFTA simply has nothing to do with "election

to Federal office."  The Political Committees concede, as they must, that TUFTA facially

contains no provision that could be construed to touch on federal campaign finance or

election law.  *See* Republican Committees' Summ. J. Reply at 1, 4-5 (noting that, as opposed

to a "broad" facial challenge, the Political Committees object to TUFTA "as applied").  But

even as applied, the Receiver's claim implicates the covered elections and conventions only

in the most tangential and immaterial way.  The Court accepts that the Stanford Defendants

contributed funds for election-related purposes,[18] and presumably the Political Committees

---

[18]Of course, the Stanford Defendants' large-scale soft money contributions to both
parties suggests that, like "many corporate contribut[ors]," they gave out of "a desire for

used the funds as such.  The Receiver's claims, however, do not implicate those uses or attempt to regulate contributions or expenditures as made for the purpose of influencing any election for Federal office.

Forcing the Political Committees to disgorge funds that presumably will come from present-day monies they would rather spend on core campaign-related activities may have a connection to topical areas, such as campaign finance, regulated by FECA.  "'[B]ut that possibility does not change [the Receiver's] case from one about [fraudulent transfer] into one about'" election to Federal office. *Altria*, 129 S. Ct. at 546 (quoting *Altria Grp., Inc. v. Good*, 501 F.3d 29, 44 (1st Cir. 2007)).  As with the issue of candidates' personal liability for state law contract claims, FECA says nothing concerning political parties and their affiliated campaign committees' liability for a host of state statutory and common law causes of action, including fraudulent transfers. *Cf. Karl Rove*, 39 F.3d at 1280.  Accordingly, the Court concludes that FECA does not expressly preempt the Receiver's TUFTA claim.

*2. FECA's Implementing Regulations Do Not Expressly Preempt the Receiver's Claims.* — An examination of the regulations related to FECA's preemption provision demonstrates that FECA's regulatory scheme, too, fails to evince an intent to preempt state law fraudulent transfer claims.  The Political Committees contend that the "Effect on State law" regulations at 11 C.F.R. § 108.7 show that FECA's "reach extends to the regulation of campaign financing for federal elective office through federal political committees."

---

access to candidates and a fear of being placed at a disadvantage in the legislative process relative to other contributors, rather than by ideological support for the candidates and parties." *McConnell*, 540 U.S. at 124-25.

Democratic Committees' Mot. to Dismiss at 12. Section 108.7 includes FECA's statutory express preemption provision verbatim in subsection (a) and, in subsections (b) and (c), supplemental preemption provisions elaborating on FECA's preemptive reach.

Section 108.7(b) provides that "Federal law supersedes State law concerning the (1) Organization and registration of political committees supporting Federal candidates; (2) Disclosure of receipts and expenditures by Federal candidates and political committees; and (3) Limitation on contributions and expenditures regarding Federal candidates and political committees." Although the Political Committees do not make the point clearly, they appear to argue that as applied TUFTA works here as a preempted "[l]imitation on contributions and expenditures." *See, e.g.*, Republican Committees' Mot. for Summ. J. at 3-4.

The Court disagrees. The Receiver's claims limit neither contributions or expenditures as those terms are used in section 108.7(b)(3). FECA's regulations, like the statute itself, rely on terms of art that render incomplete plain-text readings that are uninformed by the statute or regulation's intent in using a particular term. In relevant part, the regulations use "contribution" to refer to a "gift . . . or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office," 11 C.F.R. § 100.52(a), and "expenditure" to refer to any "purchase, payment, distribution, loan . . . , advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 11 C.F.R. § 100.111(a). Neither FECA nor its regulations define the word "limitation," but the first nontautological definition supplied by Black's defines it as "a restriction." BLACK'S LAW DICTIONARY 947 (8th ed.

2004).  Section 108.7(b)(3), therefore, preempts only state laws that place restrictions on those contributions and expenditures "made . . . for the purpose of influencing any election for Federal office."

In this light, the Receiver's claims fall outside of section 108.7(b)(3)'s scope.  The Receiver deploys TUFTA here to compel the Political Committees to disgorge the value of contributions made by the Stanford Defendants – with others' money – years ago,[19] not to effect a restriction on any person's ability to influence elections to federal office.  Similarly, although disgorgement will entail a "payment" by the Political Committees, they will make it for the purpose of satisfying a money judgment rather than influencing election for federal office.  As a matter of plain language, therefore, section 108.7(b)(3) imposes no bar to the Receiver's TUFTA claims.

The Political Committees' section 108.7(b)(3) argument, moreover, reads the provision in isolation.  Section 108.7(b)(3)'s reference to "[l]imitation[s] on contributions and expenditures" must be analyzed in light of Congress and the FEC's use of that phrasing in other places.  As the Court discusses in more detail below in analyzing FECA's preemptive scope, the statute and its regulations expressly concern only certain types of "contribution and expenditure limitations and prohibitions."  11 C.F.R. §§ 110.1-.20; *see also* 2 U.S.C. § 441a ("Limitations on contributions and expenditures").  Read in context, section 108.7(b)(3) expressly preempts only state laws that impose restrictions on contributions and

---

[19]A TUFTA plaintiff seeks to recover "judgment for the value of the asset transferred," TEX. BUS. & COM. CODE § 24.009(b), not the specific asset itself, which in many cases – as here – left the defendant's possession long ago.

expenditures, such as contribution caps, similar to those already provided for in FECA – not any generally applicable state law that might conceivably implicate contributions and expenditures. *Cf. Karl Rove*, 39 F.3d at 1280 ("Although [the defendant] attempts to stretch § 453 far enough to create a preemptive bar to applying state law to hold federal candidates personally liable, we cannot read FECA as extending that far."). Accordingly, the Court concludes that neither FECA nor its implementing regulations expressly preempt the Receiver's TUFTA claims.

### C. TUFTA Does Not Encroach on FECA's Domain

Although the presence of an express preemption provision "means that [courts] need not go beyond [the provision's] language to determine whether Congress intended the [statute] to pre-empt at least some state law, [they] must nonetheless identify the domain expressly pre-empted by that language." *Lohr*, 518 U.S. at 484 (internal quotation marks and citations omitted). In this case, that requires the Court to determine whether other indicia demonstrate that Congress intended FECA to have broader preemptive scope than that established in the Court's express preemption analysis above.[20] Such an "intent may be

---

[20]Because "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted," the Supreme Court has suggested that a statute's "pre-emptive scope . . . is governed entirely by the express [statutory] language." *Cipollone*, 505 U.S. at 517; *see also Chamber of Commerce v. Whiting*, No. 09-115, slip op. at 14 (Sup. Ct. May 26, 2011) ("Congress's 'authoritative statement is the statutory text, not the legislative history.'" (quoting *Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U. S. 546, 568 (2005))). The Court agrees as a matter of principle, but resorts to field preemption analysis here because FECA's preemptive provision supports more than one plausible plain-text reading. "[FECA's] preemption statute, then, is not so clear (if any statute ever is) as to preclude [the Court] from consulting the legislative history." *Reeder*, 733 F.2d at 545.

inferred from a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *English*, 496 U.S. at 79 (quoting *Rice*, 331 U.S. at 230 (1947)) (alterations in original). "'Where . . . the field which Congress is said to have pre-empted' includes areas that have 'been traditionally occupied by the States,'" however, "congressional intent to supersede state laws must be 'clear and manifest.'" *Id.* (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)) (alterations in original).

*1. FECA's Legislative History Fails to Support the Political Committees' Expansive Interpretation.* — The Political Committees argue that FECA's legislative history evinces Congress's desire that the statute have broad preemptive "sweep." Democratic Committees' Mot. to Dismiss Br. at 13. "The House Committee drafting the preemption provision," for example, allegedly "intended it 'to preempt all state and local laws . . . [and] to make certain that Federal Law is construed to occupy the field.'" *Id.* (quoting H.R. REP. NO. 93-1239, at 10 (1974) [hereinafter "1974 House Report"], *reprinted in*, FEC, LEGISLATIVE HISTORY OF FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS OF 1974 644 (1977) [hereinafter "FECA 1974 Compilation"])) (alterations in original). And, according to the Political Committees, "[t]he Senate Conference Report further 'make[s] it clear that the Federal law occupies the field with respect to . . . the sources of campaign funds used in Federal races.'" *Id.* (quoting

S. CONF. REP. NO. 93-443 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5618, 5638).[21]  As further

evidence, the Political Committees argue that the FEC "has broadly interpreted FECA's

preemption provision" in its enforcement actions.  *Id.* (citing FEC Adv. Op. 1999-12, at 6

(June 25, 1999).

"[A]gainst a background of dissatisfaction with [FECA as enacted in 1971],"

Congress amended FECA in 1974

> (1) To place limitations on campaign contributions and expenditures; (2) To
> facilitate the reporting and disclosure of the sources and disposition of
> campaign funds by centralizing campaign expenditure and contribution
> reporting; (3) To establish a Board of Supervisory Officers to oversee
> enforcement of and compliance with Federal campaign laws; and (4) To
> strengthen the law for public financing of Presidential general elections, and
> to authorize the use of the dollar checkoff fund for financing Presidential
> Nominating Conventions and campaigns for nomination to the office of
> President.

1974 House Report at 1-2; FECA 1974 Compilation at 635-36; *see also* Federal Election

Campaign Act Amendments of 1974, Pub. L. 93-443, 88 Stat. 1263 (1974) [hereinafter the

"1974 Amendments"].  Among a plethora of other amendments, the House Committee

version "contain[ed] two separate provisions relating to the preemption of State laws."  1974

---

[21]The relevant legislative history sources' citations have created some confusion.  For
example, the Democratic Committees cite 1974 U.S.C.C.A.N 5618 as providing Senate
Conference Report 93-443, but entering the U.S.C.C.A.N. pincite into Westlaw produces
what is titled as Senate Conference Report 93-1237.  The FECA 1974 Compilation contains
a "Report of Committee of Conference" in the form of House Conference Report 93-1438.
*See* FECA 1974 Compilation at 943.  After examining the U.S.C.C.A.N. and FECA 1974
Compilation sources, the Court is satisfied that the U.S.C.C.A.N. cite references material in
the "Joint Explanatory Statement of the Committee of Conference."  *See* 1974 U.S.C.C.A.N.
5618, 5618; FECA 1974 Compilation at 993 [hereinafter the "1974 Conference Report"].
The Court will pincite the 1974 Conference Report and all other congressional reports using
their original pagination as well as that in the FECA 1974 Compilation.

House Report at 10; FECA 1974 Compilation at 644.  Referencing then-18 U.S.C. § 591,[22]

Congress crafted a preemption provision "relating to amendments to the criminal code" in

title I of the bill "to make it clear that [FECA] [was] intended to be the sole source of

criminal sanctions for offenses involving political activities in connection with Federal

elections."  *Id.*  The other proposed preemption provision, in title III's "General Provisions,"

contained future section 453, designed to "supersede and preempt any provision of State law

with respect to election to Federal office."  *Id.*

The congressional reports related to the 1974 Amendments show that Congress

intended FECA to preempt a much narrower domain than the Political Committees claim.

To take the most off-the-mark argument first, the Political Committees quote from the 1974

Conference Report,[23] ostensibly showing that Congress intended to occupy "the field with

respect to . . . the sources of campaign funds used in Federal races."  Democratic

Committees' Mot. to Dismiss Br. at 13.  But, that portion of the report actually concerns only

the title I criminal code amendments.  The 1974 Conference Report explicitly adopted House

---

[22]In order to make FECA's definitions "controlling whenever the provisions of title 18 impact on federal elections and political activity," the Federal Election Campaign Act Amendments of 1979 repealed 18 U.S.C. § 591.  H.R. REP. 96-422 at 25 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2860, 2885; Pub. L. No. 96-187, § 201(a)(1), 93 Stat. 1339 (1980).

[23]Because "conference committee reports reflect[] the understanding of both House and Senate," they are "especially . . . authoritative [sources of] legislative history." WILLIAM N. ESKRIDGE, JR., PHILIP P. FRICKEY, & ELIZABETH GARRETT, CASES AND MATERIALS ON LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY App'x B at 27 (4th ed. 2007) [hereinafter "Eskridge"].

amendment section 104,[24] which "provided that chapter 29 of title 18, United States Code, relating to elections and political activities, supersedes and preempts provisions of state law." 1974 Conference Report at 69; FECA 1974 Compilation at 1013.  That provision – in text omitted from the Political Committees' quoting of the report in various briefs – established that FECA "occupies the field with respect to *criminal sanctions relating to* limitations on campaign expenditures, the sources of campaign funds used in Federal races, the conduct of Federal campaigns, and *similar offenses*." *Id.* (emphasis added).[25]

The Political Committees' arguments as to Congress's intended scope for section 453 fare no better.  The Political Committees correctly note that the relevant House committee intended "to make certain that [FECA] is construed to occupy the field."  1974 House Report at 10; FECA 1974 Compilation at 644.  But, it showed no signs of intending to effect a wide-ranging preemption of all state and local laws that might peripherally touch on an election. The House committee meant for FECA to preempt state law "with respect to elections to

---

[24]The Senate bill did not contain a preemption amendment to title I.

[25]As part of their broad-scope argument, the Political Committees cite FEC Advisory Opinion 1999-12. (June 25, 1999).  Although the Political Committees do not raise the point, the advisory opinion suggests that the distinction between the title I criminal and title III general preemption provisions has only "limited significance" because FECA provides for both civil and criminal penalties and the title I provisions later were incorporated into other provisions.  *See* FEC Adv. Op. 1999-12 at 5 n.6.  Even if true – and, given that courts find distinctions between criminal and civil statutes significant in numerous other contexts, the Court doubts it is – that does not change the fact that the Political Committees cite inapposite legislative history.  Congress's preemptive intent with respect to the criminal code amendments has no bearing on this dispute.

Federal office and . . . [to] be the sole authority under which *such elections* will be regulated." *Id.*

The House committee focused specifically on state laws' treatment of certain federal reports. Although FECA as originally enacted required candidates for federal office to file federal reports with appropriate state election officials, it only "encourage[d]" the state officials "to accept [the] Federal reports in satisfaction of State reporting requirements." *Id.* The 1974 Amendments made acceptance of the federal reports mandatory. It was this provision that the committee explicitly intended to have preemptive effect. *See id.* ("[T]he provision relating to encouraging State officials to accept Federal reports to satisfy State reporting requirements is deleted. Under [FECA], Federal reporting requirements will be the only reporting requirements and copies of the Federal reports must be filed with appropriate State officials.").

The 1974 Conference Report bolsters this narrow reading of Congress's intent. The Senate and the House bills included almost identical title III preemption provisions, which the Conference committee believed would have amended FECA "in essentially the same manner."[26] 1974 Conference Report at 100; FECA 1974 Compilation at 1044. The

---

[26]The House version provided that FECA "supersede[d] and preempt[ed] any provision of State law with respect to election to Federal office," 1974 House Report at 31; FECA 1974 Compilation at 665, while the Senate version did so "with respect to campaigns for nomination for election, or for election, to Federal office." S. REP. NO. 93-689, at 65 (1974); FECA 1974 Compilation at 161-62 [hereinafter "1974 Senate Report"]. To the extent the differences between the House and Senate versions has any significance, FECA's definition of "election" incorporates the Senate's separate provision for primary and other nominating elections. *See* 2 U.S.C. § 431(1).

Conference committee ultimately adopted the House version. In doing so – and in line with the 1974 House Report – the Conference committee succinctly explained that FECA "occupies the field with respect to *reporting and disclosure* of political contributions to and expenditures by Federal candidates and political committees." *Id.* at 100-01; 1044-45 (emphasis added). The 1974 Conference Report contains no other explanation of title III's intended reach except to note that it did not preempt "State laws as to the manner of qualifying as a candidate, or the dates and places of elections." *Id.* at 101; 1045.[27]

Read in context, the legislative history shows a much more restricted conception of FECA's preemptive reach than that urged by the Political Committees. Because TUFTA's disgorgement remedy is not a criminal sanction, the preemptive reach of FECA's long-repealed title I preemption provision is irrelevant to this case. And, no one suggests that the

---

[27]This advances literally an interpretation of FECA's preemptive scope at odds with precedent concerning things other than reporting and disclosure requirements. *See, e.g.*, *Weber*, 995 F.2d at 873 (holding that FECA preempted the Minnesota Congressional Campaign Reform Act, which "establishe[d] a system by which federal congressional candidates [could] agree to limit campaign expenditures and receive state funding for their campaigns" in return). The Court does not suggest that those authorities are wrong. In many cases, the nexus between a state law and election to federal office will be so strong as to justify preemption on a plain-text reading alone. *See, e.g.*, *Bunning v. Commonwealth of Kentucky*, 42 F.3d 1008, 1012 (6th Cir. 1994) (holding that FECA and its regulations expressly preempted a state law that imposed disclosure requirements and expenditure limits as applied to a federal political committee conducting polls for a Congressman). In others, the opposite might be true. *See, e.g.*, *Stern*, 924 F.2d at 475-76 (holding, in a shareholder derivative action, that corporate director defendants could not invoke FECA preemption to bar state law corporate waste claim predicated on donations to a political action committee). Although the Court concludes this case falls into the latter category, it analyzes the Political Committees' cited congressional reports to deduce whether this is instead "a situation in which the state law in question [is]," as the Political Committees contend, "close[r] to the boundaries of the domain preempted by FECA" than suggested by the Court's narrow, plain-text reading. *Weber*, 995 F.2d at 876.

Receiver's claims touch on FECA's reporting and disclosure requirements. Accordingly, the Political Committees' proffered legislative history provides no grounds for construing section 453 expressly to preempt the Receiver's TUFTA claims.

**2. FECA and Its Regulations' Structure Support the Court's Narrow Construction of FECA's Preemptive Domain. —** The Political Committees ground their next preemption objection in FECA's structure. "Specifically," they contend that "[s]ections 441a through 441f of FECA provide a comprehensive list of source restrictions on political contributions" in a manner that "makes plain Congress's intent to occupy the domain defining illegal sources of political contributions." Democratic Committees' Mot. to Dismiss Br. at 14. Allowing the Receiver's TUFTA claims would allegedly "supplement this list of illegal sources to include Ponzi scheme funds" as well as "compromise the certainty provided by FECA's source restrictions." *Id.*

The Political Committees' *expressio unius*-style argument,[28] however, accords FECA and its regulations' "[l]imitations on contributions and expenditures" an unsupportable exclusivity. 2 U.S.C. § 441a. A "proper *expressio unius* inference" as to a specific statutory provision's exclusivity must consider the provision as "viewed in the context of the overall statutory scheme." *Christensen v. Harris County*, 529 U.S. 576, 583 (2000). FECA's contribution limitations "serve[] an interest in protecting 'the integrity of our system of representative democracy'" by facilitating "[FECA's] primary purpose – 'to limit the actuality

---

[28]*Expressio unius est exclusio alterius* is "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." BLACK'S LAW DICTIONARY 620 (8th ed. 2004).

and appearance of corruption resulting from large individual financial contributions.'" *McConnell v. FEC*, 540 U.S. 93, 120 (2003) (quoting *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976)), *overruled in part on other grounds*, *Citizens United*, 130 S. Ct. 876.   FECA accomplishes that in large part by making "[v]iolations of [its contribution and expenditure provisions] . . . subject to civil enforcement action by the [FEC], criminal prosecution by the United States Department of Justice, or both."  FEC Adv. Op. 1996-05 at 2 (Mar. 14, 1996).

Viewed in that context, the relevant provisions in FECA sections 441a through 441k delineate the realm of unlawful contributions and expenditures for enforcement purposes – not to list all situations that might cause a candidate or political committee to pay out funds from its campaign coffers.  The FEC has taken the view that, "[i]n general, debt claims and liabilities are subject to relevant State law, and the Committee's 'responsibility' for satisfying the obligations [are] determined with reference to those laws."  FEC Adv. Op. 1975-102 at 1 (Jan. 29, 1976).  To that end – and pursuant to "long held" FEC policy – candidates and political committees regulated by FECA routinely use funds originally obtained in the form of contributions to satisfy debts, judgments, and other liabilities.  *See, e.g.*, FEC Adv. Op. 1989-02 at 2 (Apr. 25, 1989) ("[FECA] and [FEC] regulations do not preclude the Committee's paying the judgment rendered under State [contract] law, although this may require the Committee to use all or most of its cash on hand.").  Despite numerous amendments to FECA over its forty-year history, neither Congress nor the FEC has attempted to graft any of these potential uses of erstwhile campaign contributions onto the purportedly exclusive list of prohibited limitations on contributions and expenditures.  *Cf.*

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155-56 (2000) (inferring "effective ratifi[cation]" of agency position when Congress has enacted statutes "against [a] background of the [agency] repeatedly and consistently asserting" a particular policy interpretation); *see also Young v. Cmty. Nutrition Inst.*, 476 U.S. 974, 983 (1986) ("This failure to change the scheme under which the FDA operated is significant, for a congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.") (citations and internal quotation marks omitted).  This strongly suggests that, although FECA's domain may reach a host of activities and laws with respect to election for federal office, its occupied field does not include political committees' paying on obligations incurred pursuant to state law.

Even as applied, TUFTA falls squarely within this nonpreempted zone of state laws. The Receiver seeks only a judgment making the Political Committees liable to the Stanford Defendants' creditors under Texas fraudulent transfer law.[29]  Doing so in no way imposes a "dollar limit" on contributions or expenditures,[30] a restriction on the "[p]ublication and distribution of statements and solicitations,"[31] or a regulation of "contributions or

---

[29]*See* TEX. BUS. & COM. CODE § 24.002(3) & (4) (defining "claim" as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" and "creditor" as "a person . . . who has a claim").

[30]2 U.S.C. §§ 441a (general limitation provision) & 441g (hard currency cap).  The Receiver's claims also do not relate plausibly to any of the other numerous campaign contribution and expenditure restrictions in section 441a.

[31]2 U.S.C. § 441d.

expenditures by national banks, corporations, . . . labor organizations,"[32] "government contractors,"[33] "foreign nationals,"[34] improperly identified persons,[35] or "minors."[36]  And, although a literal reading of FECA section 441i(a) at first glance appears to support the Political Committees' position,[37] it exclusively concerns – as its caption suggests – now-prohibited "soft money" funds, which the Court addresses in more detail below.  *See Shays v. FEC*, 414 F.3d 76, 102 (D.C. Cir. 2005) (quoting *McConnell*'s observation that section

---

[32] 2 U.S.C. § 441b.

[33] 2 U.S.C. § 441c.

[34] 2 U.S.C. § 441e.

[35] 2 U.S.C. § 441f.

[36] 2 U.S.C. § 441k.

[37] "A national committee of a political party (including a national congressional campaign committee of a political party) may not . . . direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act."  2 U.S.C. § 441i(a).  Section 441i(a)'s peculiar phrasing primarily distinguishes between hard money contributions regulated by FECA and soft money funds "not subject to the. . . requirements of this Act."  *See McConnell*, 540 U.S. at 122-23, 142.  Accordingly, section 441i(a) does not bar the Receiver's claims even though paying on a judgment effects a "transfer of funds" outside of FECA's limitations and prohibitions.

Given FECA and its regulations' Byzantine reporting requirements, the Political Committees almost certainly are required to report to the FEC the use of funds to pay judgments.  But that does not prevent the Receiver from bringing his claims.  To hold otherwise effectively would read section 441i(a) and section 453 to work in tandem to exempt entirely the Political Committees from state law liability unless brought about as the result of FEC enforcement.  Section 441i(a) lacks any – let alone a "clear and manifest" – indication that Congress intended that result.  *Cf. Cipollone*, 505 U.S. at 516 (citation omitted).

441i(a) serves as the "cornerstone" of BCRA's efforts to eradicate "the so-called soft money system") (540 U.S. at 133)).

The regulation promulgated by the FEC to provide clarity to section 453's preemptive scope,[38] moreover, delineates three "supersede[d]" and six nonsuperseded areas of State law.[39]  11 C.F.R. § 108.7.  Although state law fraudulent transfer claims do not fall within any of the six nonsuperseded areas, enumerating both specifically preempted and nonpreempted areas of State law suggests an absence of exclusivity as to either category.  *Cf.* Eskridge App'x B at 19 (noting that *expressio unius* is "[i]napplicable if context suggests [the] listing is not comprehensive").  FECA may preempt unenumerated types of state laws that encroach on its domain, and certain types of state laws may lie outside of that domain even if not specifically listed as such in section 108.7(c).

Thus, the FEC's failure specifically to list in section 108.7(c) those state laws that could permissibly impose liability on candidates and political committees does not imply that such laws are preempted.  That conclusion comports with the FEC's position concerning political committees' paying debts, judgments, and other liabilities using contributed funds.

---

[38]*See Weber*, 995 F.2d at 876.

[39]Section 108.7 specifically provides that FECA does not preempt State laws concerning the following:
> (1) Manner of qualifying as a candidate or political party organization; (2) Dates and places of elections; (3) Voter registration; (4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses; (5) Candidate's personal financial disclosure; or (6) Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 C.F.R. § 300.35.

And, it is also congruent with the background presumption against preemption of state law causes of action absent clear and manifest congressional intent to do so.

Accordingly, FECA and its regulations support the Court's narrow reading of FECA's preemptive scope. Even if the Court were to credit the Political Committees' contentions that FECA contains an exclusive list of illegal contributions and expenditures, no basis exists for concluding that the Receiver's claims fall within the realm of prohibited activities, let alone attempt to contrive a wholly new type of forbidden campaign funding. At most the Receiver's claim will result in a judgment payable by the Political Committees' to the Stanford Defendants' creditors, who are represented here by the Receiver. The FEC views similar state law judgments as falling outside FECA's purview. And, FEC regulations specifically provide for the resolution of such "debts owed by candidates and political committees." 11 C.F.R. §§ 116.1-.12. The Stanford Defendants' contributions might have made the Political Committees' liable under TUFTA. But, that (at best) tangential connection to election to federal office does not transform TUFTA as used here into a campaign finance regulation.[40]

### 3. Caselaw Belies the Political Committees' Position on FECA Preemption. —

Although not necessary to establish the reach of FECA's preempted domain, the Court notes

---

[40]FECA and its regulations specifically exempt certain potentially election-related activities from their definitions of contributions and expenditures. *See* 2 U.S.C. §§ 431(8)(B) ("'contribution' does not include . . . .") & 431(9)(B) ("'expenditure' does not include . . . ."); 11 C.F.R. §§ 100.71-.94 ("exceptions to contributions") & 100.130-.155 ("exceptions to expenditures"). Paying state law judgments does not appear to fall under any of these exceptions, but it would be absurd to expect Congress and the FEC to statutorily catalogue every type of election-unrelated activity falling outside of FECA's scope.

that the little available caselaw directly relevant to the subject confirms its narrow reading. As the Second and Fifth Circuits have observed, "even with respect to election-related activities, courts have given section 453 a narrow preemptive effect in light of its legislative history." *Stern*, 924 F.2d at 475 n.3 (citing *Reeder*, 733 F.2d at 545-46 ("concluding that section 453 did not preempt a state law forbidding police officers from making political contributions to federal campaigns")); *Karl Rove*, 39 F.3d at 1280 & n.18. *Reeder* notably adopted – both for its persuasive power and assessment of the merits[41] – a Supreme Court of Missouri opinion holding that Congress intended FECA "only to preempt the limited field of statutes imposing restrictions on candidates for federal office and their campaign committees." *Pollard v. Bd. of Police Comm'rs*, 665 S.W.2d 333, 337 (Mo. 1984) (en banc) (holding that FECA did not preempt Missouri law providing that "'[n]o officer or employee in the service of [the Kansas City] police department shall directly or indirectly . . . contribute . . . any money or other valuable thing to any person on account of, or to be applied to, the promotion of any political party, political club, or any political purpose whatsoever'" (quoting MO. REV. STAT. § 84.830 (1978))).

Subsequent caselaw has taken the same tack. Courts that have found FECA preemption have done so in the context of state laws directly touching on federal elections or campaign finance.[42] Courts considering generally applicable, nonelection-related state

---

[41]*See Reeder*, 733 F.2d at 545.

[42]*See Teper*, 82 F.3d at 991 (Georgia law "prohibit[ed] a member of the [Georgia] General Assembly from accepting contributions for a campaign for federal office while the General Assembly [was] in session"); *Bunning*, 42 F.3d at 1012 (Kentucky law "attempt[ed]

laws, however, have sustained plaintiffs' claims over preemption objections.[43] And, at least two federal courts have ruled that FECA preemption does not present a cognizable federal question to justify the removal of state court suits premised on state law causes of action against candidates and political committees.[44] The Court's approach here comports with this general trend of narrowly construing section 453's preemptive reach, especially outside of its application to state laws with a direct connection to election-related activity.[45]

_____

to impose" disclosure and expenditure requirements on Congressman's federal political committee); *Weber*, 995 F.2d at 873 (Minnesota law provided state public financing to federal candidates who agreed to abide by state law campaign expenditure caps); *Friends of Phil Gramm v. Americans for Phil Gramm in '84*, 587 F. Supp. 769, 772-73 (E.D. Va. 1984) (holding that state law was preempted to the extent it was within the scope of FECA section 432(e)(4), prohibiting unauthorized political committees from using federal candidate's name in unauthorized committee's title).

[43]*See Karl Rove*, 39 F.3d at 1280-81 (Texas law contract claim against candidate for failure to pay for direct mail campaign fundraising services); *Stern*, 924 F.2d at 475-76 (New York law corporate waste claim against corporation and its directors for making corporate donations to the company's political action committee); *Friends of Phil Gramm*, 587 F. Supp. at 776 & n.8 (reasoning that "Congress intended to leave regulation of fraud in political advertising to the states" and "assum[ing], without deciding, that the applicable state law gives plaintiff a cause of action to redress injury it has suffered as a result of fraud perpetrated on third parties").

[44]*See Morton v. Crist*, Civil Action No. 2:10-CV-0450-CEH (M.D. Fla. Aug. 17, 2010) (remanding campaign contributors' suit for state law unjust enrichment, breach of contract, and breach of the implied covenants of good faith and fair dealing brought against federal senate candidate and his campaign committee); *Davis v. Vitter*, 2005 WL 840480 (E.D. La. 2005) (remanding state law breach of contract suit against federal candidate based on plaintiff's employment contract with candidate's campaign committee).

[45]At least one federal court has abstained from addressing FECA preemption when the FEC has yet to address specifically the state law at issue and the law did not fall clearly within 11 C.F.R. § 108.7's listing of preempted and nonpreempted categories of state law. *See Krikorian v. Ohio Elections Comm'n*, 2010 WL 4117556, at *10-12 (S.D. Ohio 2010) (concerning state law that prohibited candidates from "[p]ost[ing], publish[ing], circulat[ing], distribut[ing], or otherwise disseminat[ing] a false statement concerning [another] candidate"

### D. TUFTA's Application Poses No Obstacle to FECA's Purposes and Objectives

Although "[a]t best there is an inference that an express pre-emption clause forecloses implied pre-emption," the Supreme Court has consistently "reject[ed] the more absolute argument that the presence of the express pre-emption provision entirely foreclosed the possibility of conflict pre-emption." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 872 (2000) (internal quotation marks and citations omitted) (alterations in original) (emphasis removed).  Conflict preemption principles apply whenever a state law, "'under the circumstances of th[e] particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' – whether that 'obstacle' goes by the name of 'conflicting; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference' or the like." *Id.* at 873 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (alterations in original).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.  But, conflict preemption protects only "significant federal regulatory objective[s]," *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1136 (2011) (citing *Geier*, 529 U.S. at 886), as evidenced by the regulation's history and the relevant agency's interpretive views. *Id.* at 1139.

---

(quoting Ohio Rev. Code § 3517.21(B)(10))).  The Court declines to take this approach. The FEC considers state law judgments to be outside of FECA's preempted domain.  FECA provides no private right of action.  *See, e.g.*, *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 487-88 (1985).  And, the Political Committees point to no history of FEC enforcement of fraudulent transfer or unjust enrichment claims.

To avoid a "freewheeling, extratextual, and broad evaluation[]" of FECA's purposes and objectives, *Wyeth v. Levine*, 129 S. Ct. 1187, 1217 (2009) (Thomas, J., concurring), the Court limits its analysis to only the specific alleged conflicts identified by the Political Committees. The Political Committees first assert that the Receiver's claims implicate FEC regulations governing the handling and disposal of illegal contributions. Because the Court determined above that the Receiver's claims do not depend on categorizing the Stanford Defendants' contributions as illegal contributions under FECA, that objection fails. *See, e.g.*, Republican Committees' Summ. J. Br. at 5. Disgorgement made to satisfy a judgment rendered pursuant to state fraudulent transfer law has no connection to the Political Committees' treasurers' assessing, processing, and refunding of campaign contributions potentially violative of FECA. And, as suggested by both the presence of regulatory provisions governing the Political Committees' handling of debts, *see* 11 C.F.R. §§ 116.1- .12, and the FEC's position on paying state law judgments, disgorging funds need not exclusively concern illegal contributions.

The Political Committees' second conflict preemption objection concerns BCRA's soft money prohibitions. The Court reads the Political Committees to make two distinct arguments in this vein. First, and most broadly, the Republican Committees contend that paying the Receiver would require the "use [of] recently contributed 'hard money' to refund [the Stanford Defendants' largely] 'soft money' contributions[,] . . . . breach[ing] the long- standing principle of separating 'soft money' from 'hard money'" at FECA's "core." Republican Committees' Summ. J. Br. at 8. Second, because "BCRA prescribed specific,

exclusive rules for how national party committees could spend those soft money contributions [before and] after November 6, 2002," the Political Committees argue that the Receiver's claims implicate funds that may be used only for certain, statutorily-defined purposes. *See, e.g.*, Democratic Committees' Mot. to Dismiss Br. at 18. Neither argument supplies grounds for concluding that the Receiver's claims pose an obstacle to FECA's purposes and objectives.

***1. The Receiver's Claims Do Not Implicate the Purposes and Objectives Underlying FECA or BCRA's Soft Money Amendments to FECA. —*** Congress intended FECA primarily to "regulate campaign contributions and expenditures in order to eliminate pernicious influence – actual or perceived – over candidates by those who contribute large sums." *Karl Rove*, 39 F.3d at 1281.

> Under FECA, "contributions" must be made with funds that are subject to the Act's disclosure requirements and source and amount limitations. Such funds are known as "federal" or "hard" money. FECA defines the term "contribution," however, to include only the gift or advance of anything of value "made by any person for the purpose of influencing any election for *Federal* office." 2 U.S.C. § 431(8)(A)(i) (emphasis added). Donations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions. As a result, prior to the enactment of BCRA, federal law permitted corporations and unions, as well as individuals who had already made the maximum permissible contributions to federal candidates, to contribute "nonfederal money" – also known as "soft money" – to political parties for activities intended to influence state or local elections.

*McConnell*, 540 U.S. at 122-23 (emphasis in original).[46]  Over time, "the permissible uses of soft money expanded, [and] the amount of soft money raised and spent by the national political parties increased exponentially." *Id.* at 124.  In effect, "soft money . . . enabled parties and candidates to circumvent FECA's limitations on the source and amount of contributions in connection with federal elections." *Id.* at 126.

"BCRA's central provisions are designed to address Congress' concerns about the increasing use of soft money and issue advertising to influence federal elections.  Title I," relevant here, "regulates the use of soft money by political parties, officeholders, and candidates." *Id.* at 132.  Congress placed the bulk of BCRA's soft money provisions in FECA section 323, eventually codified in 2 U.S.C. § 441i.[47]  "Complex as its provisions may

---

[46]*McConnell* provides a thorough history of FECA and BCRA's origins. *See* 540 U.S. at 115-135.

[47]The Supreme Court summarized BCRA's amendments as follows:
The cornerstone of Title I is new FECA § 323(a), which prohibits national party committees and their agents from soliciting, receiving, directing, or spending any soft money.  2 U.S.C. § 441i(a) (Supp. II).  In short, § 323(a) takes national parties out of the soft-money business.  The remaining provisions of new FECA § 323 largely reinforce the restrictions in § 323(a). New FECA § 323(b) prevents the wholesale shift of soft-money influence from national to state party committees by prohibiting state and local party committees from using such funds for activities that affect federal elections. 2 U.S.C. § 441i(b). . . . .  New FECA § 323(d) reinforces these soft-money restrictions by prohibiting political parties from soliciting and donating funds to tax-exempt organizations that engage in electioneering activities.  2 U.S.C. § 441i(d).  New FECA § 323(e) restricts federal candidates and officeholders from receiving, spending, or soliciting soft money in connection with federal elections and limits their ability to do so in connection with state and local elections.   2 U.S.C. § 441i(e).   Finally, new FECA § 323(f) prevents circumvention of the restrictions on national, state, and local party committees by prohibiting state and local candidates from raising and spending soft money

be, § 323, in the main, does little more than regulate the ability of wealthy individuals, corporations, and unions to contribute large sums of money to influence federal elections, federal candidates, and federal officeholders." *Id.* at 138. Eliminating soft money contributions and expenditures, then, served as the paramount purpose and objective underlying Congress's enactment of BCRA. *See, e.g.*, *id.* at 133.

The Receiver's fraudulent transfer claim poses no obstacle to the achievement of that end. The Stanford Defendants' primarily soft money contributions did give rise to the Receiver's claims. He brings those claims, however, to vindicate the Stanford Defendants' creditors' rights under TUFTA. That neither effects a regulation of soft money *per se* nor impacts federal elections in any way. As established above: FECA's domain permits the Receiver's claims. The Receiver does not seek the specific soft money funds contributed to the Political Committees. FECA provides no private right of action. And, the FEC shows no inclination to take up the mantle of plaintiffs asserting similar state law claims.[48]

---

to fund advertisements and other public communications that promote or attack federal candidates. 2 U.S.C. § 441i(f).
*McConnell*, 540 U.S. at 133-34.

[48]The Court's review of FEC advisory opinions and enforcement actions turned up none suggesting that claims such as the Receiver's fall within the FEC's exclusive bailiwick. *See* 2 U.S.C. § 437d(3) ("Except as provided in section 437g(a)(8) of this title, the power of the Commission to initiate civil actions under subsection (a)(6) of this section shall be the exclusive civil remedy for the enforcement of the provisions of this Act."). The Republican Committees concur, admitting that "there are no FEC opinions on whether state law can govern the manner in which soft-money contributions are to be disgorged, or on whether a fraudulent transfer is a prohibited source of donations warranting a refund." Republican Committees' Reply at 3. The Republican Committees distinguish this regulatory "silen[ce]" from the statutory silence in *Karl Rove*, which they interpret as being "primar[ily] base[d]" on "FECA's failure to address personal liability of a candidate and the presence of FEC

Accordingly, the Receiver's claims are unlikely to conflict with the purposes underlying FECA's soft money provisions. *Cf. Crosby*, 530 U.S. at 380 ("'[C]onflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" (quoting *Wis. Dept. of Indus. v. Gould, Inc.*, 475 U.S. 282, 286 (1986))).

Before turning to the Political Committees' narrower soft money expenditure argument, the Court stops to address an even broader objection implicit in the Republican Committees' purposes-and-objectives contention: that state law actions conceivably implicating soft money contributions inherently conflict with FECA and BCRA's amendments, and that, therefore, claims based on those contributions should be channeled through FECA's comprehensive regulatory scheme. The practical import of this argument is that courts must read FECA to preempt state law claims against the Political Committees whenever soft money may be an issue. But, "[i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision [to that end] at some point." *Wyeth*, 129 S. Ct. at 1200. BCRA itself, however, lacked an express preemption provision, *see McConnell*, 540 U.S. at 186, despite the FEC's longstanding policy that state law suits against political actors such as the Political

_____

opinions expressly stating that state law answers the question of liability for campaign debts." *Id.* at 4.

This distinction is lost on the Court. FECA similarly fails to address campaign committees' liability for state law fraudulent transfer claims. The Political Committees point to no history of the FEC asserting jurisdiction over similar claims, and the Court has found none. It makes no difference that the FEC has yet to issue a formal opinion on the matter. Sometimes silence speaks. And, the only reasonably inference from decades of inaction is that the FEC does not interpret FECA to preempt claims like the Receiver's.

Committees generally fall outside of FECA's preempted domain and Congress's then thirty-year failure to address that issue in another manner. The reasonable inference from this is that section 453 adequately addressed any preemptive intent Congress had when it enacted BCRA. *Cf. Wyeth*, 129 S. Ct. at 1200 ("[Congress's] silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety.").[49]

Accordingly, FECA, post-BCRA, preempts state laws no differently than before. Section 453 remains the sole preemption provision applicable to the Receiver's claims. The Court has already determined that section 453's text, narrowly construed, expressly preempts state laws only "with respect to" – not "in connection with" – "election to Federal office." 2 U.S.C. 453(a). Thus, as it concerns soft money, FECA preempts state laws that either facially or as applied directly regulate the actual contributing or spending of soft money to influence federal elections. The Receiver's claims do no such thing, nor do they touch on FECA's preempted domain. The Court therefore rejects the Political Committees' attempt

---

[49]The *Wyeth* Court went on to note that "'[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to tolerate whatever tension there [is] between them.'" 129 S. Ct. at 1200 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989)) (latter alteration in original). That principle holds here. Congress enacted FECA against a backdrop of state election and campaign finance laws. Indeed, section 453 preempts only state laws "with respect to election to *Federal* office," 2 U.S.C. § 453(a) (emphasis added), suggesting on its face the existence of a realm of state regulation with respect to elections entirely outside of FECA's scope. As evidence of Congress's "intolerance" of certain forms of election-related state laws, numerous sections of FECA account for simultaneous state and federal electoral regulation. Nothing demonstrates that Congress has a similar intolerance for laws like TUFTA.

to insulate themselves from liability on any state law cause of action that potentially implicates soft money contributions.

### *2. FECA's Soft Money Expenditure Restrictions Do Not Encompass Disgorgement Pursuant to State Fraudulent Transfer Laws.* — The Political Committees next conflict preemption argument relates to Congress's placing certain restrictions in BCRA concerning the use and disposal of soft money funds.  The Political Committees contend that BCRA mandated that they use soft money funds

> *solely for the purpose* of – (I) retiring outstanding debts or obligations that were incurred solely in connection with an election held prior to November 6, 2002; or (II) paying expenses or retiring outstanding debts or paying for obligations that were incurred solely in connection with any runoff election, recount, or election contest resulting from an election held prior to November 6, 2002.

Democratic Committees's Mot. to Dismiss Br. at 18 (emphasis in original) (quoting BCRA, Pub. L. 107-155, § 402(b)(2)(B)(i)).  Any soft money funds not used for either purpose, the Political Committees further argue, could have been only "disgorged to the United States Treasury, or returned by check to the donors."  Republican Committees' Summ. J. Br. at 5-6 (quoting 11 C.F.R. § 300.12(c)).  By bringing a fraudulent transfer claim based primarily on soft money contributions, the Receiver allegedly seeks to "craft another use for those funds" in contravention of Congress's purposes in enacting BCRA.  Democratic Committees' Mot. to Dismiss Br. at 18.

Context, however, demonstrates that Congress intended the cited provisions to apply during the limited "transitional" period surrounding BCRA's effective date of November 6, 2002, BCRA § 402(b)(2), and then only to "excess soft money funds."  BCRA §

402(b)(2)(B).  The Court agrees that BCRA established exclusive procedures for campaign

committees' use of soft money funds.  But, those provisions concerned only funds that were

not spent prior to November 6, 2002.  *See* BCRA § 402(b)(2)(A) ("if a national committee

of a political party . . . has received funds described in such [FECA] section [323(a)] prior

to November 6, 2002, the rules described in subparagraph (B) [of section 402(b)(2)] shall

apply with respect to the spending of the amount of such funds in the possession of such

committee *as of such date*.") (emphasis added).  Not coincidentally, the 2002 midterm

elections were held on November 5, 2002.  Thus, until November 6, 2002, BCRA allowed

the Political Committees to spend soft money as was customary and allowed under the then-

soft-money-friendly provisions of FECA and applicable FEC regulations.

After the 2002 midterms, the Political Committees could spend any remaining soft

money funds as the Political Committees contend, e.g. on "retiring outstanding debts and

obligations that were incurred solely in connection with an election held prior to November

6, 2002," BCRA § 402(b)(2)(B)(i)(I), but only "prior to January 1, 2003."  BCRA §

402(b)(2)(B)(i).  Only those "[soft money] funds remaining after [this] payment of debts and

obligations" qualified for disgorgement to the U.S. Treasury or to the Political Committees'

respective donors.  11 C.F.R. § 300.12(c).  Even this provision, however, was time limited.

The Political Committees had to turnover funds to the U.S. Treasury or send checks to donors

"no later than December 31, 2002."  *Id.*  In no event was disgorgement to occur later than

March 31, 2003, the date by which the Political Committees were to hand over soft money

funds remaining from "[a]ny [donor] refund checks not cashed by February 28, 2003."  *Id.*

Accordingly, the Political Committees should have exhausted their soft money funds by April 1, 2003.

Even if the Receiver sought actual soft money contributions – and he does not[50] – his claims simply do not concern the disposal of soft money funds between November 6, 2002, and March 31, 2003.  Nothing in the Political Committees' cited BCRA provisions or FEC regulations indicate that Congress intended these provisions to have force beyond the limited transitional period surrounding the abolition of the soft money regime, let alone that it meant for the provisions to bar later disgorgement due to liability created by state-law fraudulent transfers of soft money contributions.

The Republican Committees' summary judgment evidence showing that they disgorged $20,000 to the U.S. Treasury may demonstrate their compliance with BCRA's transitional soft money restrictions, *see* Republican Committees' Summ. J. App. Ex. 3 [92], but that does not provide a defense to liability under TUFTA.  It just proves that the Political Committees appropriately spent soft money funds.  And, spending Ponzi scheme proceeds does not shield a recipient of fraudulently transferred funds from liability.  *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 776 & n.9 (9th Cir. 2008) (noting, in case where Receiver brought an UFTA claim against a recipient of Ponzi scheme funds, that disgorgement may occur "years after the money has been received and spent"); *Capital Distrib. Servs., Ltd. v. Ducor Exp. Airlines, Inc.*, 440 F. Supp. 2d 195, 204 (E.D.N.Y. 2006) (acknowledging that New York fraudulent conveyance law allows, "where the assets fraudulently transferred no longer

---

[50]*See supra* note 19; TEX. BUS. & COM. CODE § 24.009(b).

exist or are no longer in the possession of the transferee, a money judgment [to] be entered

against the transferee in an amount up to the value of the fraudulently transferred assets");

*Scholes v. African Enter., Inc.*, 854 F. Supp. 1315, 1328 (N.D. Ill. 1994) (observing, in

Illinois fraudulent conveyance case in Ponzi scheme context, that it is "'well-settled' that [a]

creditor may elect to recover property itself or its cash value" even when the "defendants no

longer possess the actual funds." (quoting *Tcherepnin v. Franz*, 489 F. Supp. 43, 45 (N.D.

Ill. 1980))).

> *3. The FEC Recently Verified that the Political Committees May Pay a Judgment*
>
> *in this Case.* — A recent FEC Advisory Opinion issued to the Political Committees confirms

that paying a judgment in this case will not conflict with the purposes and objectives

underlying FECA and BCRA.  The Political Committees inquired whether "they may use

donations to their respective recount funds to defend against [this action]," particularly

whether those funds could be used to "pay some or all of their legal fees *and judgment or*

*settlement costs* arising from [this action]."  FEC Adv. Op. Request 2011-03 at 1, 2 (Feb. 7,

2011).  The FEC replied in the affirmative.  *See* FEC Adv. Op. 2011-03 at 3 (Apr. 7, 2011).

Although the advisory opinion did not address the specific preemption arguments in this

case, the Political Committees provided the FEC with a copy of the Receiver's complaint as

well as the parties' motion to dismiss briefing.  Thus, the FEC was aware of the potential for

conflict between TUFTA as applied here and applicable FECA provisions and regulations.

The FEC's silence suggests that FECA does not preclude the Political Committees from

paying a judgment in this case in compliance with applicable FEC regulations.  Rather, it

tends to confirm that, despite the "*sui generis*" facts underlying this suit, FEC Adv. Op. 2011-03, Concurring Statement of Comm'r Weintraub at 2, the Receiver's sought-after money judgment will comport with the FEC's longstanding policy that FECA does not preempt the Political Committees from paying nonelection-related, state law-created liabilities.[51]

### E. Summary on Preemption

The Political Committees' preemption defenses fail as a matter of law. The Receiver's claims neither effect a regulation with respect to election to federal office nor require the Political Committees to disgorge funds for the purpose of influencing federal election. The Court therefore adheres to precedent and the background presumption against preemption of state law causes of action and narrowly construes FECA's express preemption provision to allow the Receiver's claims. The Political Committees proffer legislative history that does not support their expansive interpretation of FECA's preempted domain, and they fail to provide evidence showing that the FEC considers claims such as the Receiver's to fall within its zone of enforcement. In light of longstanding FEC policy holding that liability for state law causes of action should be determined and paid in light of applicable state law, the Court furthermore concludes that the Receiver's claims do not seek to create a new form of

---

[51]The Court takes appropriate judicial notice of the advisory opinion and related documents as publicly-available "sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b); *cf. Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (holding that a "district court took appropriate judicial notice of publicly-available documents and transcripts produced by [an administrative agency], which were matters of public record directly relevant to the issue at hand") (citation omitted).

illegal contribution or expenditure under FECA.  And, finally, the Receiver's claims pose no

obstacle to FECA's anticorruption and soft money regulatory purposes and objectives.  The

Court therefore denies the Democratic Committees' motion to dismiss and the Republican

Committees' motion for summary judgment.

### V. THE RECEIVER CARRIES HIS SUMMARY JUDGMENT BURDEN, AND THE POLITICAL COMMITTEES FAIL TO PRODUCE CONTRADICTORY EVIDENCE

"To recover the transfers from [the Stanford Defendants] to [the Political

Committees], the Receiver [is] required to demonstrate that [the Political Committees]

received transfers from [the Stanford Defendants] that were made with actual intent to

defraud." *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing actual intent provision

of the Washington State UFTA, WASH. REV. CODE § 19.40.041(a)(1)).[52]  "[T]he mere

existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Donell*, 533

F.3d at 770 (citations and internal quotation marks omitted) (alteration in original); *accord*

*Byron*, 436 F.3d at 558 ("The Receiver's proof that [the debtors] operated as a Ponzi scheme

establishe[s] the fraudulent intent behind transfers made by [the Receivership entities]."

(citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995))).  For defendants facing a

section 24.005(a)(1) "actual intent" claim, TUFTA provides a statutory defense if the

---

[52]There are no material differences between the Washington and Texas UFTA statutes. *See Byron*, 436 F.3d at 558 (noting that the provisions are both "virtually identical" to their corresponding provision in the Bankruptcy Code, 11 U.S.C. § 548) (citations and internal quotation marks omitted).

defendants "took in good faith *and* for a reasonably equivalent value." TEX. BUS. & COM. CODE § 24.009(a) (emphasis added).[53]

The Receiver carries his summary judgment burden.   The evidence he provides establishes that the Stanford Defendants operated a Ponzi scheme and were therefore insolvent at least as early as 1999 and perhaps much earlier – Van Tassel's forensic accounting of the Stanford entities remains ongoing. *See* Van Tassel Decl.; Van Tassel Supp. Decl.[54]   Among other things, the Receiver shows that the SIB CD program depended on continued infusions of cash from an ever increasing number of depositors, a "classic" Ponzi scheme. *Id.*; *see also Janvey v. Alguire*, 628 F.3d 164, 176 (5th Cir. 2010) (quoting sources describing Ponzi schemes).   The evidence further demonstrates that the Ponzi scheme was comprised of over 100 interrelated entities whose primary, if not exclusive, source of funding was derived from SIB CDs and that the Stanford Defendants' compensation was generated from the same source.[55]   *See* Van Tassel Decl.; Van Tassel Supp. Decl.   In particular – and

[53]Section 24.009(a) also prohibits recovery "against any subsequent transferee or obligee."   Because the Political Committees received the contributions directly from the Stanford Defendants, this defense does not apply here.   And, in any event, the Political Committees do not raise it.

[54]As this and other courts have observed, Van Tassel's declarations "provide clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme," *Janvey v. Alguire*, 628 F.3d 164, 176 (5th Cir. 2010), and reflect an "extraordinarily detailed analysis." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 751 F. Supp. 2d 876, 881 & n.10 (S.D. Tex. 2010) (admitting Van Tassel declarations in that related case into evidence under the residual hearsay exception in Federal Rule of Evidence 807 and over Rule 403 objections).

[55]The Republican Committees criticize Van Tassel's Supplemental Declaration for failing to distinguish sufficiently between SIB and SFGC and to trace specific funds from

in line with the law's viewing Ponzi schemes as insolvent from their inception – the evidence shows that the Stanford Defendants' "debts [were] greater than all of [their] assets at a fair valuation," TEX. BUS. & COM. CODE § 24.003(a), at the time the Stanford Defendants contributed to the Political Committees.   *Id.* § 24.005(b)(9).[56]   Although the Political Committees lodge various – and ultimately unavailing – objections to the Receiver's evidence, they have submitted no evidence that suggests the existence of a genuine issue of material fact concerning the Ponzi scheme's existence.[57]  Coupled with the above evidence, the Receiver thus sufficiently establishes that the Stanford Defendants' operated a Ponzi

---

SIB to SFGC.  The Fifth Circuit already rejected a similar objection to Van Tassel's reports in *Alguire*, noting that such arguments were "of no moment."  164 F.3d at 177.  The Fifth Circuit found that Van Tassel's declarations "made clear" that "SGC received the bulk of its revenue from commissions for the sale of the SIB CDs and fees for other services it provided to SIB related to the CD investment portfolio."  *Id.*  The Republican Committees point to no material differences in the declarations provided here that would support concluding otherwise.

[56]The Republican Committees' object to Van Tassel's insolvency analysis, contending that she wrongly excluded the value of loans made to R. Allen Stanford in calculating the amount of SIB's insolvency.  *See* Republican Committees' Supp. Reply Br. at 5.  The Republican Committees, however, fail to cite any authority supporting their preferred accounting method or to provide any evidence suggesting, as they obliquely imply, that the Stanford Defendants were solvent.  In any case, as fruits of the Ponzi scheme, neither Stanford's loans nor SIB's reported assets qualify as assets under TUFTA.  *See* TEX. BUS. & COM. CODE § 24.003(d) ("Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.").

[57]The Political Committees also failed to produce evidence suggesting that the Stanford Defendants' contributions were sourced from a "legitimate business operation." Mark A. McDermott, *Ponzi Schemes & the Law of Fraudulent and Preferential Transfers*, 72 AM. BANKR. L.J. 157, 174-175 (1998) (discussing how the existence of a debtor's legitimate business may create a fact issue that makes application of the actual intent presumption inappropriate) [hereinafter "McDermott"].

scheme.   Accordingly, the Court concludes that the Stanford Defendants made their contributions "with actual intent to hinder, delay, or defraud" as a matter of law.  *Id.* § 24.005(a)(1).

The Political Committees also fail to establish a fact issue concerning reasonably equivalent value.  *See id.* § 24.004(a) & (d) ("Value is given for a transfer . . . if, in exchange . . . , property is transferred or an antecedent debt is secured or satisfied . . . . 'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.").  "The relevant inquiry under [TUFTA] is whether the debtor received monetary . . . consideration."  *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 249 (5th Cir. 1990).  Courts considering the issue have ruled that political contributions are – at most – given for "minimal" consideration.  *See, e.g.*, *1992 Republican Senate-House Dinner Comm. v. Carolina's Pride Seafood, Inc.*, 858 F. Supp. 243, 249 (D.D.C. 1994) (noting also that "courts have been reluctant to place a value on non-monetary consideration"), *vacated on other grounds*, 158 F.R.D. 223 (vacating due to settlement) [hereinafter *Republican Dinner*].[58]   And, unsurprisingly, given the anticorruption purposes underlying campaign finance laws generally,[59] the Political Committees have produced no evidence showing that

---

[58]*Cf. United States v. Am. Bar Endowment*, 477 U.S. 105, 118 (1986) ("The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration.").

[59]*See, e.g.*, *McConnell*, 540 U.S. at 143-44 (discussing the important governmental interests justifying campaign finance laws that promote "the prevention of corruption or its appearance" (citing, *inter alia*, *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 389-90 (2000);

the Stanford Defendants' contributions were received in exchange for consideration of reasonably equivalent value.[60]

The Receiver has produced evidence that the Stanford Defendants operated a Ponzi scheme.  The Political Committees have failed to point to any evidence contradicting that showing or establishing the exchange of consideration of a reasonably equivalent value.  The "only reasonable inference" to be drawn under the circumstances is that the Stanford Defendants made their contributions with the intent to defraud their creditors.  McDermott at 174 (quoting *Merrill v. Abbott* (*In re Indep. Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987)).  The Court, therefore, grants summary judgment in favor of the Receiver.

## CONCLUSION

Because the Stanford Defendants' scheme was inherently undiscoverable to their creditors and the creditors' injuries are objectively verifiable, TUFTA's discovery rule applies to the Receiver's claims.  And, because no reasonable jury would conclude that the Receiver should have discovered the Stanford Defendants' contributions within seventy-two

---

*FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440-41 (2001)).  "'[I]n speaking of 'improper influence' and 'opportunities for abuse' in addition to '*quid pro quo* arrangements,' [the Supreme Court] [has] recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors.'"  *McConnell*, 540 U.S. at 143 (quoting *Shrink Missouri*, 528 U.S. at 389).

[60]To the extent the Political Committees raise First Amendment objections, TUFTA "appl[ies] to all entities, charitable, political, or private and any effect [it] might have on expressive activity is incidental."  *Republican Dinner*, 858 F. Supp. at 247 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  "To hold otherwise would improperly provide political organizations with fundraising avenues otherwise proscribed."  *Id.* (citing *There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*, 19 F.3d 1165, 1168 (7th Cir. 1994)).

hours of his appointment, the Receiver timely brings his claims as a matter of law. The Political Committees fail to establish that federal campaign finance laws preempt state law fraudulent transfer claims. Accordingly, the Court denies the Political Committees' motions to dismiss and the Republican Committees' motion for summary judgment.

The Receiver, on the other hand, produces evidence showing that the Stanford Defendants operated a Ponzi scheme and that their contributions were derived from Ponzi scheme proceeds. The Political Committees fail to create a fact issue concerning the Ponzi scheme's existence or the contributions' source and make no attempt to show that the contributions were made in exchange for consideration of reasonably equivalent value. The Court, therefore, grants the Receiver's motion for summary judgment.

"Ponzi schemes leave no true winners once the scheme collapses." *Donell*, 533 F.3d at 779. In recognition of that unpleasant reality, courts adhere to "the principle that equality is equity" in dealing with the aftermath of an imploded Ponzi scheme. *Id.* (citing *Cunningham*, 265 U.S. at 13). In disgorging the Stanford Defendants' contributions, the Political Committees will endure no greater hardship than that suffered by other innocent victims of the Stanford Defendants' Ponzi scheme who must do the same. *See id.* at 776 & n.9. Indeed, disgorgement "years after the money has been received and spent" has been recognized as "yet another common tragic result of a Ponzi scheme." *Id.* Although as innocent beneficiaries of the Stanford Defendants' largesse the Political Committees deserve some sympathy in facing that prospect, they are not entitled to special treatment. *See Zahra*, 910 F.2d at 249 ("The purpose of the [Texas fraudulent transfer] statute is the protection of

creditors against voluntary conveyances. *It is based upon the maxim that a man must be just before he is generous.* (quoting *Walker v. Loring*, 36 S.W. 246, 247 (Tex. 1896))) (alterations and emphasis in original).


Signed June 22, 2011.

David C. Godbey
United States District Judge


ORDER – PAGE 61